**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| STACY FAULKENBERRY<br>7715 Mt Blanc Road<br>Hanover, MD 21076<br><br>　　　　Plaintiff,<br><br>　　　　v.<br><br>LLOYD AUSTIN, Secretary of Defense<br>U.S. DEPARTMENT OF DEFENSE<br>1000 Defense Pentagon<br>Washington, DC 20301<br><br>　　　　Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)　Civil Action No._____<br>)<br>)　**JURY DEMANDED**<br>)<br>)<br>)<br>)<br>)<br>) |

## **COMPLAINT**

Plaintiff Stacy Faulkenberry brings this action against Defendant the U.S. Department of Defense for violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, and the Rehabilitation Act of 1973, 29 U.S.C. § 701. For her Complaint, she states as follows:

1.　The U.S. Department of Defense, Defense Information Systems Agency seemed eager to welcome into its workforce Plaintiff Stacy Faulkenberry, a decorated Army Special Forces combat veteran who continued to prove her dedication to her country by serving overseas for several years in a civilian role. Whatever respect and admiration Defendant displayed toward Faulkenberry gave way to open disdain once management learned she is a transgender woman. Almost immediately, Defendant created a work environment permeated by cruel remarks, shunning, isolation, and general hostility. Shortly after her arrival, management stripped Faulkenberry of higher profile job duties they had initially assigned her and relegated her to perform job duties that had been left unattended for the previous year. Management withheld from

Faulkenberry benefits it freely gave to her non-transgender teammates and told her they "would not be sad if [Faulkenberry] found [herself] another job."

2. Defendant's employees addressed Faulkenberry as "Sir" and referred to her with male pronouns. Faulkenberry's supervisor ridiculed her appearance in speaking with other employees and referred to her as "it." When Faulkenberry asked to join her supervisor and other team members for lunch, her supervisor refused, telling Faulkenberry the lunch outing is "a girls thing." Adding insult to injury, Defendant characterized Faulkenberry's discussion of filing a complaint against the agency as a threat of violence, for which it escorted her out of the workplace, placed her on leave, and investigated the underlying allegation, which was found to be baseless. Nevertheless, Defendant issued Faulkenberry a formal letter of reprimand, citing as reasons its having had to commit resources to the investigation and Faulkenberry's having burdened her co-workers because of her absence during the investigation.

3. Plaintiff asserts that Defendant discriminated against her on the basis of sex by creating a hostile work environment from the day she began working at the agency and retaliating against her after she complained of discriminatory treatment in violation of Title VII of the Civil Rights Act of 1964. Plaintiff also asserts that Defendant mishandled her confidential medical information in violation of the Rehabilitation Act of 1973.

**PARTIES**

4. Plaintiff Stacy Faulkenberry is an adult resident of the State of Maryland.

5. Defendant Lloyd Austin is the current Secretary of Defense for the U.S. Department of Defense. Secretary Austin is named in his official capacity.

## JURISDICTION

6. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States, specifically Title VII of the Civil Rights Act of 1964, 42 U.S.C § 2000e, as amended, and the Rehabilitation Act of 197, 29 U.S.C. § 701, as amended.

7. Venue properly lies in this Court pursuant to 28 U.S.C. § 1391(b) and (c) because the acts or omissions giving rise to these claims occurred in Maryland and Defendant, specifically the Defense Information Systems Agency ("DISA" or "Agency") is located and transacts business in Fort Meade, Maryland. DISA is a part of the Department of Defense ("DoD").

8. On May 1, 2018, Faulkenberry timely contacted an EEO counselor to initiate an informal complaint within 45 days of the most recent action she asserts constitutes the hostile work environment she experienced.

9. Faulkenberry filed a formal EEO complaint of discrimination and retaliation with the agency on June 22, 2018. The Agency acknowledged receipt of her formal complaint on July 3, 2018 and notified her of the claims accepted on July 29, 2018. The 180-day period for Faulkenberry's complaint expired on December 19, 2018. On July 1, 2019, Faulkenberry requested a hearing with an EEOC Administrative Judge. The EEOC Baltimore Field Office assigned her case to an administrative judge on October 27, 2019. Up to the filing of this Complaint, Faulkenberry's claims have remained before the EEOC, which did not issue a decision on the matter.

## FACTS GIVING RISE TO RELIEF

10. Stacy Faulkenberry is a transgender woman who presents as female and has legally changed her name and gender markers to reflect that she is female.

11. Faulkenberry served 25 years active duty in the U.S. Army, 15 years of which she served in the Army Special Operations community. Faulkenberry was awarded a Bronze Star for her meritorious action in the face of an armed enemy in Iraq.

12. Faulkenberry consistently earned exemplary ratings on her performance evaluations and was promoted to the level of Master Sergeant. General/Flag Officers as well as U.S. Ambassadors sought her expertise on Counter Violent Extremist Challenges.

13. On October 31, 2009, Faulkenberry was awarded an honorable discharge from active military service and transferred to the retired reserve. Due to injuries sustained over time by high-impact activities, including parachute landings during her active military service, the U.S. Department of Veterans Affairs rated Faulkenberry 90% disabled based on service-related injuries.

14. Faulkenberry began working for the U.S. European Command (EUCOM), part of DoD, in Stuttgart, Germany as a civilian employee in 2009. She served in strategic communications positions within EUCOM, Information Operations, and as an Inspector with the Office of Inspector General of the U.S. Africa Command (AFRICOM).

15. In June 2016, DoD directed Faulkenberry to transfer from her position with AFRICOM in Germany to DISA at Fort Meade, Maryland.

16. DISA is a DoD combat support agency that provides information technology systems support to DoD military operations around the world.

17. Faulkenberry presented as female at the time of her transfer to DISA. She has not undergone a surgical procedure for voice feminization. Her vocal range remains tenor, which is stereotypically male, and she stands over six feet tall.

18.     Since March 1988, Faulkenberry has maintained at least Secret clearance and for much of her career, maintained the highest-level security clearance, Top Secret/Secured Compartmented Information (TS/SCI). Faulkenberry currently holds a TS/SCI clearance.

19.     DoD assigned Faulkenberry to the role of Tasker Workflow Manager, a GS-13, Step 5 position in the Office of the Chief of Staff of DISA. Before accepting the position, Faulkenberry reviewed the position description, which reflected that her primary job duties as Tasker Workflow Manager included managing the tasker system that DISA utilized to exchange information with the Office of the Secretary of Defense and the Joint Chiefs of Staff and briefing senior DISA leadership on workflow issues.

20.     Before relocating from Europe to the U.S. to begin the job, Faulkenberry spoke by phone with her supervisor-to-be, Executive Officer of the Office of Chief of Staff, Sharon Ontiveros. Ontiveros exhibited a warm and welcoming tone to Faulkenberry as they discussed her anticipated arrival for her new position. After Faulkenberry told Ontiveros that she is a transgender woman, however, Ontiveros's tone shifted and became cold, and she provided only curt responses to Faulkenberry's questions through the balance of the call.

21.     During the call, Faulkenberry requested a moving allowance and 90 days to report for the position, which Faulkenberry understood was the typical timeframe for relocation of overseas new hires. Ontiveros, however, denied Faulkenberry's request and directed her to report to her new workplace within 30 days.

22.     On July 21, 2016, Faulkenberry reported to DISA and met with Ontiveros to discuss her new role and job duties as DISA Tasker Workflow Manager.

23. In that meeting, Faulkenberry requested Temporary Quarters Subsistence Expenses ("TQSE"), an allowance authorized by regulation to reimburse employees for costs of lodging, food, and other necessities when employees occupy temporary quarters at a new duty station.

24. In a sharp tone of voice, Ontiveros denied Faulkenberry's request; Ontiveros told Faulkenberry that DISA "did not hire" Faulkenberry and therefore was not required to provide her TQSE. Ontiveros said DISA did not "want" Faulkenberry and therefore Ontiveros did not think DISA should pay her TQSE.

25. Faulkenberry escalated her request for TQSE to DISA's Chief of Staff, Colonel Mark Rosenstein and Deputy Chief of Staff Andres Lopez, but both denied the request.

26. Faulkenberry began work as Tasker Workflow Manager on or about July 24, 2016.

27. On July 26, 2016, Ontiveros informed Faulkenberry that rather than performing the job duties of the Tasker Workflow Manager, Faulkenberry was being assigned to manage the Agency's publications program. Faulkenberry's new title was Issuance Manager.

28. Management of DISA's publications program included none of the high-level communications work that was entailed in the Tasker Workflow Manager position for which Faulkenberry was hired. Moreover, the publications program duties required less training and were far less important; the priority of the work was so low that it had not been performed or attended to over the preceding year.

29. The Agency recoded Faulkenberry's position to include the new duties that Ontiveros assigned her. The Agency further revised Faulkenberry's job duties to limit her interaction with senior leadership.

30. On July 29, 2016, Faulkenberry followed up with Lopez and provided a printout of the Joint Travel Regulation that required DISA to provide her TQSE. Rather than agree to provide

the benefits, however, Lopez told Faulkenberry that the Agency "would not be sad if [Faulkenberry] found [herself] another job," just days after she began working for DISA.

31. In or about August 2016, DISA created the position of Issuance Manager, with job duties associated with the Tasker Workflow Manager position which had been initially assigned to Faulkenberry. DISA hired another employee for the new position.

32. On or about August 3, 2016, Faulkenberry reported to Deputy of Personnel Doria Schauer that she had been subjected to hostility by Lopez and Ontiveros. Faulkenberry informed Schauer that both refused to provide her TQSE, and that Lopez had commented only days into her work for DISA that the Agency "would not be sad" if she were to find a job with a different Agency.

33. DISA approved TQSE for Faulkenberry in or around mid-August 2016.

34. Following her arrival at DISA, Faulkenberry had to park in spaces that were often a 15-minute or longer walk to the building in which she worked. In October 2016, however, Faulkenberry learned that all other members of the Chief of Staff's team were provided parking in a parking garage adjacent to the building in which they and Faulkenberry worked. DISA Workflow Manager Chaneese Martin and Office Administrative Specialist Aysa Barbie, for instance, were given a parking pass and garage access on the day they began working in the Office of the Chief of Staff.

35. Ontiveros had authority to secure Faulkenberry a parking pass and garage access and was aware that Faulkenberry was parking far from the building in which they worked; she and Faulkenberry had crossed paths multiple times while Faulkenberry was walking from her distant parking space.

36. On or around October 26, 2016, Faulkenberry told Chief of Staff employee Tonya Mitchner that she did not have access to a garage parking space like other team members did. Ontiveros was within earshot when Faulkenberry discussed the issue with Mitchner and issued Faulkenberry a parking pass shortly thereafter.

37. On October 27, 2016, DISA programmed Faulkenberry's ID card to allow her garage access.

38. After receiving the parking pass, Faulkenberry asked Colonel Rosenstein why she had not previously been provided a parking pass as had other employees. Rosenstein responded, "It's not because you are transgender."

39. In November 2016, Ontiveros and other DISA management convened a meeting with the Chief of Staff team but did not invite Faulkenberry. During that meeting, management announced that they were transferring records management responsibility from GS-13 DISA Workflow Manager Chaneese Martin to Faulkenberry. When Faulkenberry learned that she would be responsible for the additional duties and asked why they had been assigned to her, Ontiveros informed her that Martin could not handle the responsibility.

40. Records management duties are administrative and clerical in nature and are not within the position description for Faulkenberry's Issuance Manager position; these duties are typically performed by an employee at a lower grade.

41. Faulkenberry observed that Ontiveros regularly went out to lunch with other women in the office. In November 2016, wanting to be part of the team, Faulkenberry approached Ontiveros and asked to be included in group lunch outings. Ontiveros responded that Faulkenberry was not invited and would not want to go anyway because the lunches are "a girls thing."

8

42. Although the Office of the Chief of Staff routinely celebrated employees' birthdays by gathering together, engaging with one another, and doing a group sing-along of the birthday song, the office did not do so for Faulkenberry during the first two years she worked at DISA.

43. In or around fall of 2017, Lopez falsely accused Faulkenberry of "dressing inappropriately for work." In fact, Faulkenberry dressed in professional attire that was consistent with the clothing of other female employees in the workplace.

44. In or around March 24, 2017, Faulkenberry met with the civilian DISA Executive Director Anthony Montemerano to discuss her concerns regarding unfair treatment due to her gender identity. Faulkenberry described to Montemerano in detail how management had treated her since she began working at DISA and how this treatment had made her feel isolated and humiliated. Faulkenberry asked to transfer to a different working unit to escape the hostility that Ontiveros and other employees were directing toward her.

45. Montemerano admitted to Faulkenberry that he is uncomfortable around transgender people. He tried to convince Faulkenberry that the isolation and hostility she had described to him was not related to her gender identity.

46. In or around March or April 2017, Ontiveros approached Program Management Analyst Rebecca Clausen at her desk and asked Clausen what she thought "it" was going to wear to work that day. When Clausen asked what she meant by "it," Ontiveros told her that "it" referred to "Stacy [Faulkenberry]."

47. In or around January 2018, Faulkenberry requested that DISA Human Resources identify open positions that would be appropriate for her skill set.

48. On or around February 8, 2018, Editor Sue Cullen began emailing Faulkenberry, repeatedly alleging that Faulkenberry was not making progress on certain assignments, which was

9

untrue. Faulkenberry had been conducting her work in a consistent manner, and Cullen had not previously scrutinized Faulkenberry's work or subjected her to this type of criticism. Faulkenberry reported Cullen's unwarranted criticism to then-Chief of Staff Colonel Joel Lindeman. Cullen then stopped being unduly critical of Faulkenberry.

49.     On February 18, 2018, Faulkenberry complained to Executive Officer Jennifer Augustine that Ontiveros had created a hostile work environment. Faulkenberry described to Augustine how Ontiveros was treating Faulkenberry and told her that the work environment was having a negative impact on her health. Faulkenberry requested a transfer. Faulkenberry explained that unless the situation could be addressed, she would be compelled to file a complaint to seek a remedy.

50.     Although Faulkenberry identified a suitable, open position for transfer, Augustine insisted there was "no billet for" the open position.

51.     Soon after this meeting, Ontiveros told Faulkenberry that she had heard Faulkenberry had reported being unhappy to management. During that conversation, Faulkenberry asked Ontiveros to transfer her to another position. Ontiveros did not respond to her request.

52.     On March 20, 2018, Faulkenberry participated in a phone interview for a position with the DOD Joint Service Provider ("JSP") at the Pentagon. Faulkenberry believed the interview went very well. The interviewer started the interview by offering Faulkenberry a position that he described as primarily administrative. Faulkenberry responded that that was "not [her] cup of tea," and the interviewer then asked more about her skill set. The interviewer said he had a position that involved stakeholder management and that he thought Faulkenberry would be a good fit for it. He said he wanted Faulkenberry to start as soon as possible and that he would call DISA Human

Resources to work out the details. Faulkenberry was relieved and excited by the prospect of working for a manager who might value her contributions and treat her fairly.

53. Soon after the interview, Faulkenberry received a call from DISA Chief of Workforce Management Ava Marie Howard. Howard started the conversation by saying, "Sorry, Stacy – I think I messed up." She described to Faulkenberry an earlier call that Howard had had with the JSP interviewer, during which the interviewer repeatedly referred to Faulkenberry with male pronouns. Howard corrected the interviewer and explained that Faulkenberry is transgender and wishes to be referred to by female pronouns, "she/her." Howard told Faulkenberry that after she shared this information with the interviewer, the tone of the phone call changed, and the interviewer exhibited disinterest in hiring Faulkenberry.

54. The interviewer never followed up with Faulkenberry, and the Joint Service Provider did not hire her.

55. Agency employees called Faulkenberry "Sir" or referred to her with male pronouns, even though they were aware that she wished to be addressed as a female. During a later EEOC proceeding, even the Agency's attorney addressed Faulkenberry as "Sir."

56. In April 2018, Faulkenberry was feeling hopeless about her work environment improving; she had reported her concerns to many people and tried to find ways to leave the Office of the Chief of Staff but felt like she was stuck in a situation that would not improve.

57. On Friday, April 20, 2018, Faulkenberry told DISA's chaplain and Chaneese Martin that she was going to "cross the Rubicon," meaning she felt like she would finally move forward with filing an EEO complaint in hopes of finding a remedy for her ongoing mistreatment.

58. That same day, Faulkenberry spoke with two protocol employees, Kellie Washburn and Scott Slindy, in an office breakroom. Faulkenberry shared with them her disappointment with

11

the way Ontiveros was treating her and told them of her intent to file an EEO complaint. Faulkenberry again used the phrase "cross the Rubicon" to refer to her finally filing a complaint after voicing her concerns about harassment informally for almost two years. Anticipating that management would be upset when they learned she filed an EEO complaint, Faulkenberry told Washburn and Slindy, "Management is going to have a bad day on Monday," or similar words. Trying to make light of what was a very trying experience for her, Faulkenberry jokingly suggested she, Washburn, and Slindy take the office Keurig coffee machine while the rest of the team was at an offsite meeting so that they could watch the effects of caffeine withdrawal on the team the next week.

59. On the morning of Monday, April 23, 2018, Ontiveros called Faulkenberry into her office and told Faulkenberry that the Agency was concerned about a "threat of violence" she had allegedly made, and that it was therefore placing Faulkenberry on administrative leave while the matter was investigated.

60. Faulkenberry told Ontiveros she had not made any threat of violence. Instead, Faulkenberry explained, she had told others that she intended to file a complaint of discrimination and harassment. Faulkenberry voiced concern to Ontiveros that the allegation she had threatened violence and the investigation into that allegation were discriminatory and retaliatory and part of a pattern of mistreatment by Ontiveros and others because of her gender identity.

61. DISA immediately placed Faulkenberry on leave, had security escort her through the building's main hallway to the exit, and took away her identification badge.

62. On April 27, 2018, an official investigating the matter told Faulkenberry that the allegations were based on her comment that management would "have a bad day on Monday" –

12

the comment Faulkenberry made in reference to management's reaction upon learning she filed an EEO complaint.

63. Following its investigation, the Agency concluded that Faulkenberry had engaged in no wrongdoing, and it cleared her of any charge of having threatened workplace violence.

64. Notwithstanding that finding, Ontiveros issued Faulkenberry a Letter of Reprimand ("LOR") on May 30, 2018, charging her with "Conduct Unbecoming" based on the alleged threat of violence that the Agency had already investigated and found unsubstantiated. Ontiveros asserted in the LOR that Faulkenberry's comments made DISA employees feel "uncomfortable about [her] possible intentions towards [her] coworkers." Although the Agency itself had placed Faulkenberry on administrative leave while it investigated the alleged threats of violence, Ontiveros reprimanded Faulkenberry for the fact that coworkers had to assume her responsibilities while she was on leave. Moreover, although the Agency itself elected to investigate the unfounded allegations against Faulkenberry, Ontiveros reprimanded Faulkenberry for the investigation having required "numerous man-hours being utilized by the inquiry official."

65. In the LOR, Ontiveros wrote, "I counseled you several times regarding my expectations of your professionalism at all times during your workday;" this is untrue. DISA policy requires counseling prior to issuance of an LOR, but Ontiveros had not counseled Faulkenberry concerning workplace conduct or any other issue.

66. Upon receipt of the LOR, Faulkenberry asked Ontiveros to provide her examples of other situations in which she had counseled employees on their professionalism; Ontiveros was unable to offer even one. Faulkenberry repeated her concerns that Ontiveros was discriminating and retaliating against her. Ontiveros responded, "I'm still holding things on you."

13

67. Other employees under the organizational leadership of the Chief of Staff's Office who had been accused of violating the workplace violence policy were treated more favorably. For instance, two non-transgender employees were alleged to have made threats of violence or even engaged in violence in the workplace. Unlike Faulkenberry, neither was escorted off the premises.

68. Upon information and belief, both of those employees' alleged threats of violence or actual violence were addressed by Colonel Joel Lindeman and Scott Addis, the same management officials who reviewed the allegations against Faulkenberry and decided on the response.

69. After being placed on leave, on May 1, 2018, Faulkenberry filed an informal EEO Complaint alleging discrimination based on gender identity and retaliation for her complaints of discrimination.

70. Around July 2018, management conducted an investigation into Faulkenberry's harassment complaint. However, it took no apparent action to remedy the hostile environment or address the harassing behavior Faulkenberry had described.

71. Faulkenberry suffered anxiety and increased stress due to the way Ontiveros and others treated her in the workplace. Her treating physician diagnosed her with Adjustment Disorder. To help manage her symptoms, Faulkenberry submitted a request for a reasonable accommodation of reassignment to a position in which Ontiveros would not be her supervisor. Faulkenberry submitted supporting medical documentation along with her request for reasonable accommodation.

72. Although laws and regulations require that medical information accompanying a request for reasonable accommodations, such as that made by Faulkenberry, be held in a strictly confidential manner, the Agency failed to do so. In this case, Ontiveros obtained access to the

confidential records and then forwarded Faulkenberry's medical records to employees who did not have a need to know about the request, including her supervisors. Ontiveros also forwarded the Faulkenberry's medical records to her personal web-based email account.

73. After a new Chief of Staff assumed the position in 2018, Faulkenberry was reassigned to a position outside of the supervision of Ontiveros.

74. DISA left the publications position it assigned Faulkenberry vacant for two years after she transferred to another position in 2018.

## COUNT ONE
### Hostile Work Environment Based on Sex and Gender Identity in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C.2000e, as amended

75. Plaintiff incorporates by reference each of the allegations contained in the preceding paragraphs of this Complaint as if set forth here in full.

76. Defendant subjected Plaintiff to hostile, unwelcome, and unlawful conduct on the basis of her sex and gender identity.

77. Plaintiff was subjected to unwelcome conduct because she is a transgender woman.

78. Plaintiff repeatedly placed Defendant on notice of the hostile work environment, but Defendant failed to take reasonable care to prevent and promptly correct the harassment.

79. Plaintiff reported the harassment to multiple Agency managers.

80. Defendant's harassment had the purpose or effect of unreasonably interfering with her work performance and creating an intimidating, hostile, or offensive work environment.

81. Defendant failed to address the harassment promptly and adequately.

82. Defendant's harassment of Plaintiff was sufficiently severe or pervasive as to alter the conditions of Plaintiff's employment.

83. Defendant treated non-transgender employees more favorably than Plaintiff.

84. As a direct and proximate result of Defendant's actions, Plaintiff suffered and continues to suffer reputational harm, increased medical costs, emotional distress, loss of enjoyment of life, anxiety, lost earning potential, and expenses for past and future care.

## COUNT TWO
### Retaliation in violation of Title VII of the Civil Rights Act of 1964
### 42 U.S.C.2000e, as amended

85. Plaintiff incorporates by reference each of the allegations contained in the preceding paragraphs of this Complaint as if set forth here in full.

86. Plaintiff engaged in protected activity when she complained to her supervisor and other management officials about discrimination and harassment.

87. Defendant was aware of Plaintiff's protected oppositional activity.

88. Defendant subjected Plaintiff to numerous adverse actions, including harassment, shunning, isolation, threats, false allegations, undue scrutiny, removal from Defendant's facilities, placement on administrative leave, issuance of a formal reprimand, removal of job duties, and other conduct that would reasonably dissuade an employee from engaging in protected conduct.

89. Defendant treated employees who did not engage in protected activity more favorably than Plaintiff.

90. As a direct and proximate result of Defendant's actions, Plaintiff suffered and continues to suffer reputational harm, increased medical costs, emotional distress, loss of enjoyment of life, anxiety, lost earning potential, and expenses for past and future medical and psychological care.

## COUNT III
## Violation of Confidentiality Provisions of the Rehabilitation Act of 1973, 29 U.S.C. § 701, as amended

91.     Plaintiff incorporates by reference each of the allegations contained in the preceding paragraphs of this Complaint as if set forth here in full.

92.     Plaintiff provided Defendant with medical information in support of her request for a reasonable accommodation for her disability.

93.     Defendant is required to treat medical information provided by Plaintiff as a "confidential medical record." 29 C.F.R. § 1630.14(b)(1), (c)(1), (d)(1); *see also* 29 U.S.C. § 791(g) (applying the standards under Title I of the Americans with Disabilities Act of 1990 to the Rehabilitation Act).

94.     Plaintiff's manager shared Plaintiff's confidential medical information with individuals who did not have a need to know the information and sent it to her personal email address.

95.     Defendant failed to maintain the confidentiality of Plaintiff's medical records.

96.     Defendant's disclosure of Plaintiff's confidential medical information to employees who had no need to view it and to a non-governmental web-based personal email account is a *per se* violation of the Rehabilitation Act.

97.     As a direct and proximate result of the Agency's actions, Plaintiff suffered and continues to suffer reputational harm, increased medical costs, emotional distress, loss of enjoyment of life, anxiety, lost earning potential, and expenses for past and future medical and psychological care.

**PRAYER FOR RELIEF**

WHEREFORE, the premises considered, Plaintiff Stacy Faulkenberry respectfully prays that this Honorable Court:

1. Enter judgment in favor of Plaintiff on each of her claims;

2. Enter judgment against Defendant U.S. Department of Defense on all counts contained herein;

3. Declare Defendant' conduct in violation of Title VII of the Civil Rights Act of 1964;

4. Declare Defendant's conduct in violation of Rehabilitation Act;

5. Award Plaintiff damages for all damages available to her under the law;

6. Award Plaintiff compensatory damages in an amount to be determined by a jury;

7. Award Plaintiff reasonable attorneys' fees, costs, and expenses;

8. Award Plaintiff pre-judgment interest and post-judgment interest;

9. Grant Plaintiff such equitable relief as is just and proper, including expungement of unwarranted appraisals, disciplinary actions, and other derogatory information;

10. Grant such other relief as this Court deems just and proper.

Date: May 12, 2022     Respectfully submitted,

CORREIA & PUTH, PLLC

 */s/ Lauren A. Khouri*
Subhashini Bollini (Bar No. 18343)
Lauren A. Khouri (Bar No. 19549)
1400 16th Street NW, Suite 450
Washington, D.C. 20036
Tel: (202) 602-6500
Fax: (202) 602-6501
sbollini@correiaputh.com
lkhouri@correiaputh.com
*Counsel for Plaintiff*