# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

STACY FAULKENBERRY,                    *

    *Plaintiff,*                          *

    v.                                  *      Civil Case No: 1:22-cv-01150-JMC

U.S. DEPARTMENT OF DEFENSE,
                                     *

    *Defendant.*

    *   *   *   *   *   *   *   *   *   *   *   *

## <u>MEMORANDUM OPINION</u>

Plaintiff Stacy Faulkenberry filed suit against Defendant U.S. Department of Defense on May 12, 2022. (ECF No. 1). On December 15, 2022, Plaintiff filed an Amended Complaint and asserted three counts: (1) Hostile Work Environment Based on Sex and Gender Identity in Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e, as amended ("Title VII"), (2) Retaliation in Violation of Title VII, and (3) Violation of Confidentiality Provisions of the Rehabilitation Act of 1973, 29 U.S.C. § 701, as amended. (ECF No. 24 at pp. 18–20).[1] Currently before the Court are two motions: (1) Defendant's Motion to Dismiss Amended Complaint or, in the Alternative, for Summary Judgment (ECF No. 25) and (2) Plaintiff's Motion for Discovery Pursuant to Rule 56(d) (ECF No. 28). Regarding Defendant's Motion, the Court also has reviewed Plaintiff's Opposition (ECF No. 29) and Defendant's Reply (ECF No. 31). Furthermore, regarding Plaintiff's Motion, the Court also has reviewed Defendant's Opposition (ECF No. 30) and Plaintiff's Reply (ECF No. 32). The Court finds that no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2021). For the reasons explained below, Defendant's Motion, treated as a motion to dismiss, is granted as to Counts I and II, which are hereby dismissed without prejudice. As to

---

[1] When the Court cites to a specific page number or range of page numbers, the Court is referring to the page numbers provided in the electronic filing stamps located at the top of every electronically filed document.

Count III, Defendant's Motion is denied without prejudice as to Defendant's ability to again move for summary judgment following the close of discovery.   Furthermore, Plaintiff's Motion is granted to the extent Plaintiff seeks discovery as to Count III.

## I.   BACKGROUND

### A.   *Facts Pertinent to Defendant's Motion to Dismiss*

"At the motion to dismiss stage, the Court takes the allegations of the complaint as true, . . . and [it] construes any disputed allegations in the light most favorable to the plaintiff . . . ." *Krell v. Queen Anne's Cnty.*, No. JKB-18-637, 2018 WL 6523883, at *2 (D. Md. Dec. 12, 2018) (other citations omitted).

Plaintiff is a transgender woman who presents as a female, and she has legally changed her name to reflect that she is a female.  (ECF No. 24 at p. 4, ¶ 11).  Plaintiff is a decorated Army Special Forces combat veteran.  *Id.* at p. 1, ¶ 1.  Plaintiff is a Bronze Star recipient who served twenty-five years of active duty in the U.S. Army, of which fifteen of those years were spent in the Army Special Operations community.  *Id.* at p. 4, ¶ 12.  Plaintiff received her Bronze Star for her meritorious conduct in the face of an armed enemy in Iraq.  *Id.*  Following an honorable discharge, Plaintiff began working as a civilian employee for the U.S. European Command— which is part of the Department of Defense ("DOD")—in Stuttgart, Germany.  *Id.* at p. 4, ¶¶ 14– 15.  In June 2016, the DOD directed Plaintiff to transfer to the Defense Information Systems Agency ("DISA") located at Fort Meade, Maryland.  *Id.* at p. 4, ¶ 17.  The DOD assigned Plaintiff to the role of Tasker Workflow Manager, which is a position responsible for (1) managing the Tasker system that DISA utilized to exchange information with the Office of the Secretary of Defense and the Joint Chiefs of Staff, and (2) briefing DISA's senior leadership on workflow issues.  *Id.* at p. 5, ¶ 20.

Prior to relocating for her position with DISA, Plaintiff spoke by phone with her supervisor-to-be, Executive Officer of the Office of Chief of Staff, Sharon Ontiveros. *Id.* at p. 5, ¶ 21. At the time of this transfer, Plaintiff presented as a female but possessed the vocal range more typically associated with a male. *Id.* at p. 5, ¶ 18. Although Ms. Ontiveros at first exhibited a warm and welcoming tone for a portion of the phone call, Ms. Ontiveros' tone shifted and became cold after Plaintiff disclosed that Plaintiff is a transgender woman. *Id.* at p. 5, ¶ 21. After Plaintiff's disclosure, Ms. Ontiveros provided curt responses to Plaintiff's questions for the remainder of the call. *Id.* Despite Plaintiff's request for a moving allowance and a period of ninety days to report for Plaintiff's new position, Ms. Ontiveros directed Plaintiff to report within thirty days. *Id.* at p. 5, ¶ 22. On July 21, 2016, Plaintiff reported to DISA and had her first in-person meeting with Ms. Ontiveros. *Id.* at p. 6, ¶ 23. During that meeting, Plaintiff requested Temporary Quarters Subsistence Expenses ("TQSE"), which is an allowance authorized by regulation to reimburse employees for certain expenses when employees occupy temporary quarters at a new duty station. *Id.* at p. 6, ¶ 24. In a sharp tone of voice, Ms. Ontiveros denied Plaintiff's request and informed Plaintiff that DISA did not want Plaintiff. *Id.* at p. 6, ¶ 25. Plaintiff escalated her TQSE request to two other DISA employees: (1) Chief of Staff, Col. Mark Rosenstein, and (2) Deputy Chief of Staff, Andres Lopez. *Id.* at p. 6, ¶ 26. However, her request was again denied. *Id.*

Plaintiff began work as the Tasker Workflow Manager on or about July 24, 2016. *Id.* at p. 6, ¶ 27. On July 26, 2016, Ms. Ontiveros informed Plaintiff that Plaintiff was being reassigned to the position of Issuance Manager. *Id.* at p. 6, ¶ 28. In this different role, Plaintiff would manage DISA's publication program. *Id.* Unlike the position of Tasker Workflow Manager, the position of Issuance Manager did not include high-level communications work. *Id.* at p. 6, ¶ 29. The duties of Issuance Manager required less training, and were far less important, than those of the Tasker

Workflow Manager.  *Id.*  DISA further revised Plaintiff's job duties to limit Plaintiff's interaction with senior leadership.  *Id.* at p. 6, ¶ 30.

On July 29, 2016, Plaintiff again raised the issue of TQSE with Mr. Lopez.  *Id.* at p. 7, ¶ 31.  In addition to again denying Plaintiff's request, Mr. Lopez informed Plaintiff that DISA "would not be sad if [Plaintiff] found [herself] another job[.]"  *Id.*  On or about August 3, 2016, Plaintiff informed Deputy of Personnel, Doria Schauer, of the hostility exhibited towards Plaintiff by Mr. Lopez and Ms. Ontiveros.  *Id.* at p. 7, ¶ 33.  Plaintiff informed Ms. Schauer that Plaintiff had not observed DISA management treating other employees the way management treated Plaintiff.  *Id.* at p. 7, ¶ 34.  In mid-August 2016, DISA approved Plaintiff's request for TQSE.  *Id.* at p. 7, ¶ 35.

Following her arrival at DISA, Plaintiff had to park in spaces that often required at least a fifteen-minute walk to the building in which she worked.  *Id.* at p. 7, ¶ 36.  However, in October 2016, Plaintiff learned that all the other members of the Chief of Staff's team were provided parking in a parking garage adjacent to the building in which Plaintiff worked.  *Id.* at p. 7, ¶ 36.  At least two other DISA employees were given a pass and access to the garage on the day they began working.  *Id.* at pp. 7–8, ¶ 36.  Ms. Ontiveros had authority to secure Plaintiff a parking pass and garage access, and Ms. Ontiveros was aware that Plaintiff was parking far from the building in which they worked.  *Id.* at p. 8, ¶ 37.  On October 26, 2016, Plaintiff informed a Chief of Staff employee, Tonya Mitchner, that Plaintiff did not have access to the parking garage, and Ms. Ontiveros was within earshot of this conversation.  *Id.* at p. 8, ¶ 38.  The following day, DISA programed Plaintiff's identification card to include access to the parking garage.  *Id.* at p. 8, ¶ 39.  After receiving parking access, Plaintiff asked Col. Rosenstein why Plaintiff had not been provided

with a parking pass sooner. *Id.* at p. 8, ¶ 40. Col. Rosenstein responded, "It's not because you are transgender." *Id.*

Plaintiff observed that Ms. Ontiveros regularly went out to lunch with other women in the office. *Id.* at p. 9, ¶ 44. In November 2016, wanting to be a part of the team, Plaintiff asked Ms. Ontiveros if Plaintiff could be included in the group lunch outings. *Id.* Ms. Ontiveros stated that Plaintiff would not be invited and that Plaintiff would not want to attend because lunches are "a girls thing." *Id.* Ms. Ontiveros' response was given within an open office space and was overheard by at least one other DISA employee, Rebecca Clausen. *Id.* at p. 9, ¶ 45. Further regarding the social life in the workplace, Plaintiff's birthday was not celebrated for Plaintiff's first two years of employment despite the Office of the Chief of Staff routinely celebrating the birthdays of other employees. *Id.* at p. 9, ¶ 48. Furthermore, although Ms. Ontiveros met with employees in her office multiple times throughout the day, Ms. Ontiveros rarely spoke to Plaintiff in the workplace. *Id.* at p. 10, ¶ 50. On one occasion in March or April 2017, Ms. Ontiveros, while in the workplace, approached Ms. Clausen and asked what Ms. Clausen thought "it" was going to wear that day. *Id.* at p. 10, ¶ 54. When Ms. Clausen asked what Ms. Ontiveros meant by "it," Ms. Ontiveros clarified that she was referring to Plaintiff. *Id.*

In or around fall 2017, Mr. Lopez falsely accused Plaintiff of dressing inappropriately for work. *Id.* at p. 10, ¶ 51. However, Plaintiff dressed in professional attire that was consistent with the manner in which other female employees dressed in the workplace. *Id.* In or around March 2017, Plaintiff met with civilian DISA Executive Director, Anthony Montemerano. *Id.* at p. 10, ¶ 52. Plaintiff described to Mr. Montemerano in detail how management had treated Plaintiff since she began working at DISA, and Plaintiff described how the treatment she received made her feel isolated and humiliated. *Id.* During this conversation, Plaintiff requested a transfer to a different

working unit to escape the hostility Ms. Ontiveros and other coworkers directed towards Plaintiff. *Id.* Mr. Montemerano admitted to Plaintiff that he was uncomfortable around transgender people, but Mr. Montemerano tried to convince Plaintiff that the isolation and hostility Plaintiff described could not be attributed to Plaintiff's gender identity. *Id.* at p. 10, ¶ 53.

In or around January 2018, Plaintiff requested that DISA Human Resources identify open positions appropriate for Plaintiff's skill set. *Id.* at p. 11, ¶ 55. On February 8, 2018, Editor Sue Cullen began emailing Plaintiff and falsely alleging that Plaintiff was not making progress on certain projects. *Id.* at p. 11, ¶ 56. Plaintiff reported this unwarranted criticism to then-Chief of Staff Col. Joel Lindeman, and Ms. Cullen stopped expressing her criticism. *Id.* On February 18, 2018, Plaintiff complained to Executive Officer Jennifer Augustine that Ms. Ontiveros had created a hostile work environment. *Id.* at p. 11, ¶ 57. Plaintiff explained to Ms. Augustine how Ms. Ontiveros' treatment of Plaintiff was negatively impacting Plaintiff's health. *Id.* Plaintiff again requested a transfer, and Plaintiff informed Ms. Augustine that Plaintiff would be compelled to file a complaint and seek a remedy if the situation was not addressed. *Id.* Soon after Plaintiff's meeting with Ms. Augustine, Ms. Ontiveros informed Plaintiff that Ms. Ontiveros had heard that Plaintiff complained to management. *Id.* at p. 11, ¶ 59. During this exchange, Plaintiff requested that Ms. Ontiveros transfer Plaintiff, but Ms. Ontiveros ignored this request. *Id.*

On March 20, 2018, Plaintiff participated in a phone interview for a position with the DOD Joint Service Provider at the Pentagon. *Id.* at p. 11, ¶ 60. Plaintiff felt that the interview went well, and the interviewer indicated that there was a position for which Plaintiff would be a good fit. *Id.* at p. 11–12, ¶ 60. The interviewer stated that he wanted Plaintiff to begin as soon as possible, and he would call DISA Human Resources to work out the details. *Id.* However, soon after the interview, DISA Chief of Workforce Management, Ava Marie Howard, called Plaintiff

to discuss an issue. *Id.* at p. 12, ¶ 61. Ms. Howard indicated that she spoke with the interviewer and informed the interviewer that Plaintiff was transgender. *Id.* Ms. Howard disclosed this information to the interviewer because the interviewer mistakenly referred to Plaintiff with male pronouns while speaking with Ms. Howard. *Id.* Ms. Howard informed Plaintiff that upon learning this information, the interviewer's tone changed and that the interviewer then expressed disinterest in hiring Plaintiff. *Id.* The interviewer did not follow up with Plaintiff, and Plaintiff was never hired for the JSP position. *Id.* at p. 12, ¶ 62.

In April 2018, Plaintiff felt hopeless about her working environment. *Id.* at p. 13, ¶ 65. On Friday, April 20, 2018, Plaintiff told DISA's chaplain and Chaneese Martin that Plaintiff was going to "cross the Rubicon." *Id.* at p. 13, ¶ 66. By this, Plaintiff meant that she was going to file an EEO complaint. *Id.* That same day, Plaintiff spoke with two protocol employees, Kellie Washburn and Scott Slindee, in an office breakroom. *Id.* at p. 13, ¶ 67. Plaintiff spoke to Ms. Washburn and Mr. Slindee regarding Plaintiff's disappointment with the way Ms. Ontiveros was treating Plaintiff. *Id.* Plaintiff also informed Ms. Washburn and Mr. Slindee that Plaintiff intended to file a formal EEO complaint. *Id.* Anticipating that management would be upset over Plaintiff filing a complaint, Plaintiff stated that "[m]anagement is going to have a bad day on Monday," or similar words. *Id.*

While still speaking with Ms. Washburn and Mr. Slindee, Plaintiff jokingly suggested that the three of them take the office Keurig machine while the rest of the team was at an offsite meeting. *Id.* at p. 13, ¶ 68. Plaintiff jokingly surmised that taking the Keurig machine would result in caffeine withdrawal and would place her coworkers in a foul mood. *Id.* Plaintiff further joked that such foul moods might result in her coworkers attacking one another, and Plaintiff stated that if such actions occurred, some coworkers "might not make it out alive[.]" *Id.*

On April 23, 2018, Ms. Ontiveros called Plaintiff into Ms. Ontiveros' office and told Plaintiff that the agency was concerned about a threat of violence Plaintiff made.  *Id.* at p. 14, ¶ 69.  Ms. Ontiveros further informed Plaintiff that Plaintiff was on administrative leave while the agency investigated the matter.  *Id.*  Plaintiff stated that she did not make a threat of violence but intended to file a complaint of discrimination and harassment.  *Id.* at p. 14, ¶ 70.  Despite her assertions, Plaintiff was escorted by security through the work building's main hallway.  *Id.* at p. 14, ¶ 71.  Plaintiff's coworkers witnessed Plaintiff's removal from the work building.  *Id.* at p. 14, ¶ 72.  On April 27, 2018, an official investigating the alleged threat informed Plaintiff that the allegations were based on Plaintiff's comment that management would "have a bad day on Monday[.]"  *Id.* at p. 14, ¶ 73.  On May 1, 2018, while still on administrative leave, Plaintiff filed an informal EEO complaint alleging discrimination based on gender identity and retaliation for her complaints of discrimination.  *Id.* at p. 14, ¶ 74.  Plaintiff's placement on administrative leave lasted for two weeks.  *Id.* at p. 15, ¶ 75.

Following the investigation, the agency concluded that Plaintiff had not engaged in any wrongdoing, and the agency cleared Plaintiff of any charge of threatening workplace violence.  *Id.* at p. 15, ¶ 76.  Upon Plaintiff's return to work, one of Plaintiff's coworkers informed Plaintiff that the coworker overheard members of the security office saying that something happened and Plaintiff would not be returning to work.  *Id.* at p. 15, ¶ 77.  Despite Plaintiff being cleared by the security office, Ms. Ontiveros issued Plaintiff a Letter of Reprimand ("LOR") on May 30, 2018, charging plaintiff with "Conduct Unbecoming" based on the alleged threat of violence.  *Id.* at p. 15, ¶ 78.  Although Plaintiff was placed on administrative leave despite her protests, the LOR reprimanded Plaintiff for the fact that Plaintiff's coworkers had to assume Plaintiff's responsibilities until Plaintiff returned.  *Id.*  In the LOR, Ms. Ontiveros indicated that she had

counseled Plaintiff several times regarding the need to be professional at all times throughout the workday.  *Id.* at p. 15, ¶ 79.  However, Ms. Ontiveros had never counseled Plaintiff concerning workplace conduct or any other issue.  *Id.* at pp. 15–16, ¶ 79.  When Plaintiff confronted Ms. Ontiveros regarding the counseling the LOR referenced, Ms. Ontiveros could not provide one example of any such counseling.  *Id.* at p. 16, ¶ 80.  Plaintiff repeated her concerns regarding discrimination and retaliation, but Ms. Ontiveros' response was "I'm still holding things on you." *Id.*

Other employees who had been accused of violating the workplace violence policy while under the organizational leadership of the Chief of Staff's Office were treated more favorably than Plaintiff.  *Id.* at p. 16, ¶ 81.  For example, two non-transgender employees were alleged to have made threats of violence or even engaged in violence, but neither were escorted from the premises. *Id.*  These occurrences were reviewed by the same management officials who reviewed the allegations levied against Plaintiff: Col. Joel Lindeman and Scott Addis.  *Id.* at p. 16, ¶ 82.

Around July 2018, management investigated Plaintiff's harassment complaint, but this inquiry was separate from the EEO investigation.  *Id.* at p. 16, ¶ 83.  However, management took no apparent action to remedy the behavior Plaintiff described.  *Id.*  In June 2018, Plaintiff submitted a request for a reasonable work accommodation of reassignment to a position in which Ms. Ontiveros would not be Plaintiff's supervisor.  *Id.* at pp. 16–17, ¶ 85.  Along with her request for a reasonable accommodation, Plaintiff submitted supporting medical documentation.  *Id.* at p. 17, ¶ 86.  Plaintiff's supporting medical documentation indicated that Plaintiff began treatment on April 30, 2018, and Plaintiff presented with symptoms of anxiety, depression, and sleep disturbances.  *Id.*  The agency asked clarifying questions, and Plaintiff's medical provider submitted additional documentation which described Plaintiff's impairment as "severe."  *Id.*  Ms.

Ontiveros obtained access to Plaintiff's medical records submitted in conjunction with Plaintiff's request for a reasonable accommodation. *Id.* at p. 17, ¶ 87. Ms. Ontiveros forwarded the documents to other employees who did not have a need to know about Plaintiff's request, including Ms. Ontiveros' supervisors. *Id.*

Plaintiff discovered that Ms. Ontiveros provided the medical records to other employees and management officials who did not have a need to know about Plaintiff's request for a reasonable accommodation. *Id.* at p. 17, ¶¶ 88–89. Ms. Ontiveros also forwarded the medical documents to her own personal web-based email address. *Id.* at p. 17, ¶ 88. Furthermore, Ms. Ontiveros sent other emails about Plaintiff—including emails concerning Plaintiff's complaint about discrimination and retaliation—to Ms. Ontiveros' husband. *Id.* Plaintiff reported Ms. Ontiveros' disclosures to the EEO office. *Id.* at p. 18, ¶ 89. After a new Chief of Staff assumed the position in 2018, Plaintiff was reassigned to a position outside of the supervision of Ms. Ontiveros. *Id.* at p. 18, ¶ 90. DISA left the publications position vacant for two years after Plaintiff transferred to another position. *Id.* at p. 18, ¶ 91.

### B.  *Facts Pertinent to Plaintiff's Request for Discovery*

The parties attended an initial scheduling conference with an Administrative Law Judge ("ALJ") on November 7, 2019, during which discovery was scheduled to conclude on February 28, 2020. (ECF No. 30 at p. 2). Also in November 2019, Plaintiff moved for sanctions against Defendant for Defendant's failure to create a thorough and impartial Report of Investigation ("ROI") in accordance with EEOC regulations.[2] (ECF No. 28-1 at p. 3, ¶ 12). The parties engaged in discovery, and the discovery deadline was extended to March 17, 2020. (ECF No. 30 at p. 2).

---

[2] This motion was never resolved prior to Plaintiff filing suit in this Court. (ECF No. 28-1 at p. 3, ¶ 12). Despite Defendant's reliance on the approximately 300-page ROI in its Motion, Plaintiff contends that the material in the ROI is far less substantial than the page count. (ECF No. 32 at p. 6).

Thereafter, the COVID-19 pandemic added complications to discovery, and litigation of discovery continued until on or around March 2022. *Id.*

Although Plaintiff did not fully utilize the number of depositions available to her at the administrative level, Plaintiff asserts that strategic decisions had to be made because of "time constraints and the impeding shutdowns related to the beginning of COVID-19 in March 2020." (ECF No. 32 at p. 6). Plaintiff "took only four depositions before discovery paused in March 2020 due to the Covid-19 pandemic." (ECF No. 28-1 at p. 3). Although Plaintiff's counsel sought to take video depositions of Col. Lindeman and Ms. Ontiveros, Defendant was not able to accommodate such depositions due to work-related restrictions regarding Zoom. (ECF No. 30 at p. 4). On April 24, 2020, the ALJ assigned to Plaintiff's case held a conference call to address several discovery disputes, including the scheduling of remote depositions. *Id.* Although the parties engaged in discussions regarding the logistics of conducting the depositions of Col. Lindeman and Ms. Ontiveros, Plaintiff did not depose either witness through the modalities Defendant offered. *Id.* at pp. 4–5.

On November 4, 2021, Plaintiff's case was reassigned to a new ALJ. *Id.* at p. 5. The newly assigned ALJ ordered Plaintiff to take one of the two outstanding depositions within thirty days of February 22, 2022. *Id.* On April 20, 2022, Plaintiff filed her Notice of Forthcoming Federal Court Filing. *Id.* On May 13, 2022, the ALJ assigned to Plaintiff's case issued an Order Dismissing Complaint. *Id.* The scope of discovery at the administrative level was still in dispute and was the subject of a pending motion at the time Plaintiff decided to pursue her case in this Court. (ECF No. 28-1 at p. 3).

## II.    STANDARD OF REVIEW

### A. *Rule 12(b)(6) Failure to State a Claim*

"Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, a complaint must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.'" *Love v. Rumgay*, No. RDB-13-1402, 2016 WL 1028001, at *4 (D. Md. Mar. 15, 2016) (quoting Fed. R. Civ. P. 8(a)(2)). "Rule 12(b)(6) of the Federal Rules of Civil Procedure authorizes the dismissal of a complaint if it fails to state a claim upon which relief can be granted." *Love*, 2016 WL 1028001, at *4. The purpose of Rule 12(b)(6) is "to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006).

The Supreme Court of the United States' opinions in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 544 (2007), "require that complaints in civil actions be alleged with greater specificity than previously required." *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012) (other citation omitted). When ruling on a Rule 12(b)(6) motion to dismiss, a court must apply "[t]wo working principles . . . ." *Iqbal*, 556 U.S. at 678. First, although a court must accept as true all the factual allegations contained in a complaint, any legal conclusions that are drawn from those facts are not afforded such deference. *Id.* (stating that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice[]" to plead a claim). Second, a complaint shall be dismissed if it does not allege a "plausible claim for relief . . . ." *Id.* at 679. "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 663 (other citation omitted). In determining whether a plaintiff has stated a plausible claim

for relief, a court must "draw on its judicial experience and common sense." *Id.* at 679 (other citation omitted).

"As a general rule, the court does not consider extrinsic evidence at the motion to dismiss stage . . . ." *Reamer v. State Auto. Mut. Ins. Co.*, 556 F. Supp. 3d 544, 549 (D. Md. 2021) (other citation omitted). However, "the court may consider, without converting the motion to dismiss into one for summary judgment, documents attached to the complaint as exhibits, and documents attached to a motion to dismiss if the document is 'integral to the complaint and there is no dispute about the document's authenticity.'" *Id.* (quoting *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016)). "A document is 'integral' to the complaint if its 'very existence, and not the mere information it contains, gives rise to the legal rights asserted.'" *Reamer*, 556 F. Supp. 3d at 59 (citing *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011)).

In addition to considering a complaint when ruling on a Rule 12(b)(6) motion to dismiss, a court may consider "matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rts., Ltd*, 551 U.S. 308, 322 (2007); *United States v. Unisys Corp.*, 178 F. Supp. 3d 358, 363, n. 2 (E.D. Va. 2016). "[A] court may properly take judicial notice of matters of public record and other information that, under Federal Rule of Evidence 201, constitute adjudicative facts." *Taylor v. Go-Getters, Inc.*, No. ELH-20-3624, 2022 WL 1127902, *7 (D. Md. Apr. 15, 2022) (other citations and internal quotation marks omitted). "In employment discrimination cases, courts often take judicial notice of EEOC charges and EEOC decisions." *Id.* (other citations omitted). Therefore, to the extent Defendant utilizes such exhibits when arguing that Plaintiff failed to exhaust administrative remedies, the Court may consider those exhibits.

Defendant styles its Motion as a motion to dismiss under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56.  "A motion styled in this manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure."  *Pevia v. Hogan*, 443 F. Supp. 3d 612, 625 (D. Md. 2020).  The Court has "*complete discretion* to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it."  *Id.* at 626 (other citation omitted) (emphasis added).

The Court declines to treat Defendant's Motion as one for summary judgment and will instead decide it pursuant to Rule 12(b)(6).  As set forth more fully in Section III, the Court finds such conversion unnecessary as to Counts I and II as Plaintiff has failed to state an adequate claim as to those counts.  As to Count III, which the Court finds Plaintiff has sufficiently pleaded, the Court also declines to consider Defendant's Motion as one for summary judgment, but for different reasons as explained immediately below.

"Ordinarily, summary judgment is inappropriate where the parties have not had an opportunity for reasonable discovery."  *Id.* (other citations and internal quotation marks omitted).  "To raise adequately the issue that discovery is needed, the nonmovant typically must file an affidavit or declaration pursuant to Rule 56(d) . . . explaining why, for specified reasons, it cannot present facts essential to justify its opposition, without needed discovery."  *Id.* (other citations and internal quotation marks omitted).

In response to Defendant's Motion, Plaintiff filed a Motion for Discovery Pursuant to Rule 56(d).  (ECF No. 28).  Defendant opposes on the grounds that Plaintiff's Motion "seeks to retread ground that either was explored, or was chosen not to explore, during the earlier EEOC proceeding."  (ECF No. 30 at p. 2).  Defendant argues that "Plaintiff's failure to take advantage of

the discovery process at the administrative level is not justification to delay the adjudicative process before this Court, and Plaintiff's Rule 56(d) Motion should be denied." *Id.* Amongst other cases referenced in string cites or explanatory parentheticals, Defendant relies on *Kowalewski v. Gates*. (ECF No. 30 at pp. 6–7). Defendant cites *Kowalewski* for the proposition that "[d]enial of additional discovery is appropriate . . . when the materials sought by the requesting party could have been discovered earlier, including in the course of administrative discovery." *Kowalewski v. Gates*, No. CCB-12-3288, 2014 WL 1212972, *7 (D. Md. Mar. 24, 2014). In *Kowalewski*, the Court found that the plaintiff "could have sought the desired materials during the administrative case before the [EEOC.]" *Id.* at *7. Importantly, the Court in *Kowalewski* acknowledged the plaintiff's lack of diligence in pursuing discovery at the administrative level. *Id.* at *8. The Court finds that the facts of Plaintiff's case are distinguishable from *Kowalewski*, as well as the other cases to which Defendant cites.

Here, unlike in *Kowalewski*, the Court cannot conclude that Plaintiff's discovery efforts at the administrative level lacked in diligence. To the extent Plaintiff did not pursue all possible depositions available to her, Plaintiff provides the reasonable explanation of complications brought on by the COVID-19 pandemic. Furthermore, at the time discovery paused in March 2020, the scope of discovery appears to have been heavily contested by both parties. Perhaps most important of all, Ms. Ontiveros, "the primary management official alleged to have discriminated and retaliated against [Plaintiff], . . . " has yet to be deposed. (ECF No. 28 at p. 2). *See Works v. Colvin*, 519 F. App'x 176, 184 (4th Cir. 2013) (per curiam) ("Furthermore, because certain key players in this matter . . . did not testify at the administrative hearing and were not deposed at that level or at the district court level, there is a 'real possibility that [the plaintiff] was prejudiced by the denial' of her discovery request."). Although the Court is "cognizant that parties who are

'dilatory in pursuing discovery' should not find solace in Rule 56(d) . . . [,]" the Court is not convinced that Plaintiff was in fact dilatory in pursuing discovery at the administrative level.

As to Defendant's argument that "Plaintiff has not identified how the additional discovery that she seeks would create disputes of material fact with respect to her claims[,]" the Court finds this argument unavailing.  (ECF No. 30 at p. 9).  First, the Court wishes to reiterate the fact that Defendant's Motion is one for dismissal, or in the alternative, for summary judgment.  As such, discovery has yet to be conducted within this forum.  Moving for "summary judgment before discovery forces the nonmoving party into a fencing match without a sword or mask." *Callender v. Callender*, No. TDC-15-4015, 2016 WL 3647613, at *6 (D. Md. June 30, 2016) (quoting *McCray v. Dep't of Transp., Md. Transit Admin.*, 741 F.3d 480, 483 (4th Cir. 2014)).  Plaintiff's counsel has provided the Court with a declaration indicating that two key players as to Plaintiff's Count III—Ms. Ontiveros and Col. Lindeman—have not been deposed.  (ECF No. 28-1 at p. 4).  Regarding disputes of material fact, Defendant's first argument itself justifies permitting Plaintiff to proceed with discovery.[3]  Defendant argues that "Plaintiff has not identified specific facts that she seeks to elicit from Ms. Ontiveros to preclude summary judgment."  (ECF No. 30 at p. 10).  However, this case is almost entirely about the motives and actions of Ms. Ontiveros.  Plaintiff's intentions in deposing Ms. Ontiveros, the key player in this case, are obvious, and such a deposition is likely to shed light on Ms. Ontiveros motives and the extent of the allegedly impermissible

---

[3] Although the Court is considering whether the evidence sought by Plaintiff will create disputes of material fact, the Court recognizes that *Works v. Colvin*—although not binding precedent—sheds light on what is required by that standard. *Works* involved an employment discrimination suit brought under the Rehabilitation Act, 29 U.S.C. §§ 701, against the Social Security Administration ("SSA").  *Works*, 519 F. App'x at 176.  After considering and rejecting arguments from the defendant which were nearly identical to Defendant's arguments here, *Works* vacated the district court's order granting summary judgment on a motion to dismiss, or in the alternative, for summary judgment.  *Id.* at 188.  In determining whether discovery should have been permitted prior to ruling on an alternative motion for summary judgment, *Works* considered how the plaintiff's request for discovery bore "on the disputed nature of each of these claims."  *Id.* at 184–87.

document disclosure.  Furthermore, Plaintiff's counsel maintains that Plaintiff's Rehabilitation Act claim "was not subject to any discovery before the administrative forum."  (ECF No. 28-1 at p. 5, ¶ 22); *see also* (ECF No. 29 at p. 24, n. 5) ("Plaintiff's Rehab Act claim was not part of discovery before the EEOC.").

Based on the fact-intensive nature of Plaintiff's Count III, and Plaintiff's counsel's affidavit asserting the need for discovery (ECF No. 28-1), Plaintiff's Motion is hereby granted to the extent that Plaintiff's Count III remains.

## III.    ANALYSIS

At the outset of its analysis, the Court recognizes that Title VII protects employees from an employer's discrimination when such discrimination is based on an employee's sexual orientation.  "The Supreme court held in *Bostock v. Clayton County*, --- U.S. ----, 140 S. Ct. 1731, 207 L.Ed.2d 218 (2020), that employment discrimination against transgender individuals is sex discrimination under Title VII of the Civil rights Act of 1964, 42 U.S.C. § 2000e et seq."  *See Hammons v. Univ. of Md. Med. Sys. Corp.*, No. 20-2088, 2023 WL 121741, *7 (D. Md. Jan. 6, 2023) (other citation omitted).

### A.    *Plaintiff Has Not Failed to Exhaust Her Administrative Remedies.*

Plaintiff has satisfied the prerequisite of exhausting administrative remedies prior to filing suit in this Court.  "Before filing suit under Title VII . . . a plaintiff must exhaust administrative remedies."  *Taylor*, 2022 WL 1127902 at *8.  "The filing of an administrative charge is not simply a formality to be rushed through so that an individual can quickly file his subsequent lawsuit."  *Chacko v. Patuxent Inst.*, 429 F.3d 505, 510 (4th Cir. 2005).  Rather, "[r]equiring exhaustion of administrative remedies serves twin objectives: protecting agency authority in the administrative process and promot[ing] efficiency in the resolution of claims."  *Stewart v. Iancu*, 912 F.3d 693,

699 (4th Cir. 2019) (quoting *Woodford v. Ngo*, 548 U.S. 81, 89 (2006)) (internal quotation marks omitted).  "If an employee fails to exhaust his administrative remedies, he is generally barred from filing suit."  *Taylor*, 2022 WL 1127902 at *8 (other citations omitted).

The administrative exhaustion requirement also has a substantive effect: "Generally, it limits the scope of a plaintiff's federal lawsuit to those parties and claims contained in the administrative charge."  *Id.*  (other citations omitted).  Therefore, "when the claims in [the] court complaint are broader than 'the allegation of a discrete act or acts in [the] administrative charge,' they are procedurally barred."  *Parker v. Reema Consulting Servs., Inc.*, 915 F.3d 297, 306 (4th Cir. 2019) (quoting *Chacko*, 429 F.3d at 508–10)).  "To illustrate, the Fourth Circuit has stated that a claim will . . . typically be barred if the administrative charge alleges one type of discrimination—such as discriminatory failure to promote—and the claim encompasses another type—such as discrimination in pay and benefits."  *Taylor*, 2022 WL 1127902 at *8 (other citations and internal quotation marks omitted).  "That said, the EEOC charge does not strictly limit a . . . suit which may follow; rather, the scope of the civil action is confined only by the scope of the administrative investigation that can reasonably be expected to follow the charge of discrimination[.]"  *Id.* at *9 (other citations and internal quotations marks omitted).  Therefore, "a federal court may hear a claim that was not presented to the EEOC so long as it is reasonably related to plaintiff's EEOC charge and can be expected to follow from a reasonable administrative investigation . . . ."  *Id.* (other citations and internal quotation marks omitted).

Defendant argues that Plaintiff's Amended Complaint raises allegations in support of Plaintiff's hostile work environment claim that "were not alleged in [Plaintiff's] EEO complaint and therefore, were not accepted for investigation and have not been exhausted."  (ECF No. 25-1 at p. 20).  Specifically, Defendant takes aim at three allegations in the Amended Complaint: (1)

that Plaintiff was misgendered by unidentified DISA employees as "sir" at unidentified times, (2) that Plaintiff was misgendered by Ms. Ontiveros as "it" in March or April 2017, and (3) that Mr. Lopez accused Plaintiff of dressing inappropriately in fall 2017. *Id.* at pp. 19–20.

In turn, Plaintiff argues that "Defendant's assertion that Plaintiff needed to raise each fact that comprised her hostile work environment during the administrative process in order to fully exhaust is contrary to long stating precedent." (ECF No. 29 at p. 14). According to Plaintiff, rather than alleging that the at-issue allegations constitute different types of discrimination, Defendant is instead attacking three alleged facts out of ninety-one paragraphs of alleged facts. *Id.* at pp. 14–15.

The Court agrees with Plaintiff. The three allegations Defendant takes issue with are reasonably related to those in Plaintiff's EEO charge, i.e., they are supportive of Plaintiff's claim of a hostile work environment. Furthermore, the claims are those which would likely follow from a reasonable administrative investigation. The hostile work environment alleged in Plaintiff's EEO complaint (ECF No. 25-4) clearly arose as a product of Plaintiff's identity as a transgender woman, along with an apparent refusal to accept Plaintiff as another female colleague in the workplace. As such, the Court concludes that instances of misgendering Plaintiff would likely be discovered pursuant to a reasonable administrative investigation. In fact—although the Court is not considering Plaintiff's deposition—Defendant admits as much in describing how such instances of misgendering were discussed during Plaintiff's deposition. (ECF No. 25-1 at p. 20). The Court further concludes that the alleged instance of Mr. Lopez critiquing Plaintiff's work attire should also have followed from a reasonable administrative investigation focused on discrimination predicated on Plaintiff's status as a transgender woman. Plaintiff's EEO complaint put Defendant on notice of the alleged negative treatment Mr. Lopez subjected Plaintiff to on the

basis of Plaintiff's transgender identity.  (ECF No. 25-4 at p. 3).  As such, Mr. Lopez's alleged critique of Plaintiff's work attire is of a "sufficiently close nexus with the assertions contained in the . . . [EEO] Charge such that [it] could be expected to follow from a reasonable administrative investigation."  *Taylor*, 2022 WL 1127902 at *9 (other citation and internal quotation marks omitted).

Regarding the timing of these three at-issue allegations, the Court recognizes that "[h]ostile work environment claims are different in kind from discrete acts."  *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 103 (2002).  "Because their very nature involves repeated conduct, the 'unlawful employment practice,' §2000e-5(e)(1), cannot be said to occur on any particular day.  It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own."  *Id.* (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).  To that end, "[t]he timely filing provision only requires that a Title VII plaintiff file a charge within a certain number of days after the unlawful practice happened.  It does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period."  *Morgan*, 536 U.S. at 117.  "Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability."  *Id.*  Therefore, Defendant's timing argument in its Reply misses the mark.  (ECF No. 31 at p. 2, n. 1).  Defendant has not challenged the timing of Plaintiff's EEO complaint alleging a hostile work environment.  Rather, Defendant has challenged Plaintiff's ability to rely upon three alleged occurrences in supporting Plaintiff's charge of a hostile work environment.  Plaintiff's Amended Complaint has properly alleged facts in support of Plaintiff's hostile work environment claim predicated on Plaintiff's status as a transgender woman.

Accordingly, the Court concludes that Plaintiff has properly exhausted her administrative remedies, and the Court will not dismiss the three allegations with which Defendant takes issue.

### B. *Plaintiff Has Not Sufficiently Pleaded a Claim of Hostile Work Environment.*

The Court cannot conclude that Plaintiff has sufficiently pleaded a claim of hostile work environment under Title VII.  "The elements of a Title VII claim for hostile work environment are: '(1) unwelcome conduct; (2) that is based on [a protected status]; (3) which is sufficiently severe or pervasive to alter . . . conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer."  *Milo v. CyberCore Techs., Inc.*, No. RDB-18-3145, 2019 WL 4447400, *5 (D. Md. Sep. 17, 2019) (quoting *Strothers v. City of Laurel*, 895 F.3d 317, 328 (4th Cir. 2018)) (other citation omitted).  Defendant only challenges whether Plaintiff has sufficiently pleaded elements two and three.  (ECF No. 25-1, pp. 20–26).

Plaintiff has certainly set forth facts sufficient to withstand a motion to dismiss regarding suffering unwelcome conduct based on her protected status as a transgender woman.  However, Plaintiff has failed to allege conduct sufficiently severe or pervasive to maintain her claim.  "The severe or pervasive element has both a subjective and objective component."  *Leonard v. Towson Univ.*, No. GLR-21-1464, 2022 WL 3867949, *8 (D. Md Aug. 30, 2022) (quoting *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 208 (4th Cir. 2019)).  "To show that [a] defendant's conduct was sufficiently severe or pervasive, the 'objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances.'"  *Hooten v. Walmart Inc.*, No. 5:20-CV-697-BO, 2021 WL 1234507, *3 (E.D.N.C. Apr. 1, 2021) (quoting *Onacle v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998)) (other citation and internal quotation marks omitted).  The circumstances a court considers in determining whether the alleged conduct is objectively hostile include "the frequency of the discriminatory conduct; its

severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Milo*, 2019 WL 4447400 at *6 (quoting *Fox v. Gen. Motors Corp.*, 247 F.3d 169, 178 (4th Cir. 2001)).  To be sure, the severe and pervasive element sets a high bar, such that the law tolerates a level of poor conduct by an employer that is at odds with the courtesy and respect that an employee might not unreasonably expect. As such, "[R]ude treatment by [coworkers], callous behavior by [one's] superiors, or a routine difference of opinion and personality conflict with [one's] supervisor, are not actionable under Title VII." *Milo*, 2019 WL 4447400 at *6 (quoting *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008)) (other citations and internal quotations omitted).

Similarly, "offhand comments[] and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment" *Leonard*, 2022 WL 3867949 at *8.  "Indeed, even the utterance of an epithet may not, on its own, be enough to alter the conditions of employment under Title VII." *Id.* (other citation omitted).  "Rather, a hostile work environment is one that is permeated with discriminatory intimidation, ridicule, and insult." *Id.* (other citations and internal quotation marks omitted).

Plaintiff's allegations are strikingly similar to those of the plaintiffs in *Milo* and *Hooten*. In *Milo*, the plaintiff—a transgender woman—supported her claim of a hostile work environment with several allegations, some of which included: (1) that her supervisor commented on the inappropriate length of the plaintiff's skirt, (2) a co-worker told the plaintiff that the co-worker "hated" transgender people, (3) the plaintiff was reprimanded for a loud, contentious argument with a co-worker although the co-worker was not reprimanded, (5) a manager witnessed other co-workers misgendering the plaintiff yet told the plaintiff to "lay low," and (6) a co-worker filed a complaint against the plaintiff because the co-worker felt like he had to "walk[] on eggshells"

around the plaintiff.  *Milo*, 2019 WL 4447400 at *2.  In *Hooten*, the plaintiff—a transgender woman—supported her claim of a hostile work environment with similar allegations, including: (1) an assistant manager called the plaintiff "it" and avoided her, and (2) another manager rolled her eyes at the plaintiff and disciplined the plaintiff for a lack of productivity.  *Hooten*, 2021 WL 1234507 at *1.  In *Milo*, the Court concluded that the plaintiff alleged "a mere handful of incidents, none are physically threatening although she was offended by her co-worker's references to 'him' or 'he' rather than 'her' or 'she,' the alleged incidents were sporadic, and none were extremely serious."  *Milo*, 2019 WL 4447400 at *6.  As such, the Court concluded that the plaintiff's alleged instances of discrimination did "not describe harassment that is severe or pervasive enough to plausibly describe a hostile work environment."  *Id.*  Furthermore, the court in *Hooten* concluded that "[w]hile plaintiff alleges conduct that may be unprofessional or rude, rude treatment, *even by a supervisor*, is not enough to sustain a hostile work environment claim."  *Hooten*, 2021 WL 1234507 at *3 (emphasis added).

With these two factually similar cases in mind—both of which the Court finds persuasive—the Court turns to Plaintiff's allegations.  Plaintiff has alleged inappropriate and unprofessional conduct imputable to Defendant, including but not limited to: (1) denial of a parking permit and relocation benefits freely given to other employees, (2) a change of job duties early on in Plaintiff's employment, in part to seclude Plaintiff from leadership, (3) negative comments from management regarding Plaintiff's work attire, (4) misgendering Plaintiff, (5) Ms. Ontiveros referring to Plaintiff—a fellow human being and co-worker—as "it," (6) excluding Plaintiff from girls' lunch and ignoring Plaintiff's birthday, and (7) escorting Plaintiff from the work premises for a perceived threat of violence.  *See* (ECF No. 24; ECF No. 29 at p. 19).  As reprehensibly as the Court views the vast majority of this alleged conduct, it is not the stuff of which hostile work environment

claims are made.  Plaintiff has alleged sporadic occurrences, none of which meet the "extremely serious" standard described above.  Regarding the parking permit, Plaintiff's identification card was programed to include access to the employee parking garage the day after Plaintiff complained about not having such access.  Regarding the one instance in which Mr. Lopez falsely accused Plaintiff of dressing inappropriately, this is the only such instance Plaintiff has alleged.  *Cf. Doe v. Triangle Doughnuts, LLC*, 472 F. Supp. 3d 115, 129 (E.D. Pa. 2020) (concluding that the plaintiff—a transgender woman—had made out a claim of hostile work environment when, amongst several other allegations, the plaintiff claimed she was subject to a stricter dress code than other female and cisgender employees).

Regarding Ms. Ontiveros' treatment of Plaintiff, the Court recognizes that "[i]n measuring the severity of harassing conduct, the status of the harasser may be a significant factor . . . .  Simply put, a supervisor's power and authority invests [*sic*] his or her harassing conduct with a particular threatening character."  *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 278 (4th Cir. 2015) (other citations and internal quotation marks omitted).  Ms. Ontiveros rarely spoke with Plaintiff, excluded Plaintiff from social lunch outings, and referred to Plaintiff as "it" on one known occasion.  However, such conduct simply does not rise to the level of severe or hostile necessary to sustain Plaintiff's claim.  *See e.g., Daugherty v. Food Lion, LLC*, No. 1:04CV278, 2006 WL 1642233 (W.D.N.C. June 13, 2006) (finding the plaintiff's allegations regarding a supervisor's refusal to make eye-contact and avoidance of the plaintiff rude but insufficient to sustain a hostile work environment claim).  The Court also finds Mr. Montemerano's admission of discomfort with transgender people to fall far short of the mark.  *See Milo*, 2019 WL 4447400 at *2 (no hostile work environment found when a co-worker told the plaintiff that the co-worker hated transgender people, and the plaintiff reported this to the plaintiff's supervisor).

Perhaps the most contentious aspect of Defendant's conduct is Defendant's escorting of Plaintiff from the work premises and placing Plaintiff on administrative leave pending a two-week-long investigation of a perceived workplace threat.  Of all Plaintiff's allegations, this is as close as Defendant came to physically threatening Plaintiff.  For two reasons, the Court cannot conclude that such conduct is sufficient to support a claim of hostile work environment.  First, Plaintiff merely alleges that she was escorted out of the work premises by security, albeit that this escorting occurred through the main hallway of the work building and in view of other employees.  Even considering such conduct to be a show of potential force, far worse is required.  *See Hester v. Bd. of Edu. of Prince George's Cnty.*, No. TDC-22-0128, 2022 WL 7088293, *6 (D. Md. Oct. 12, 2022) (finding that the transgender plaintiff's allegations of misgendering, bullying, and *physical attacks and threats* were sufficient to support a claim of a severe and pervasive hostile work environment) (emphasis added).  Second, Plaintiff admits that she was escorted from the work premises and placed on administrative leave because Defendant perceived Plaintiff's statements as a threat.  The context of this alleged threat is relevant.  Plaintiff used the term "cross the Rubicon"[4] and stated that "management was going to have a bad day" the following Monday.  Furthermore, Plaintiff's history cannot be ignored.  Plaintiff is a twenty-five-year veteran of the U.S. Army and earned a Bronze Star for meritorious action in the face of an armed enemy in Iraq.  Even more, Plaintiff is a decorated Army Special Forces combat veteran.  Plaintiff's history—not as a transgender woman but as a person with exceptional and commendable military background and experience in combat and special operations—makes the perceived threat all the more severe, regardless of Plaintiff's intent or explanation behind it.  This is not to say that Plaintiff's honorable

---

[4] "On January 10, 49 B.C.E., General Julius Caesar entered Roman territory by crossing the Rubicon, a stream in what is now Northern Italy.  In crossing the Rubicon, Caesar began a civil war that signaled the end of the Roman Republic." *Nat'l Geographic Soc'y*, Jan *10, 49 BC: Caesar Crosses the Rubicon*, NAT'L GEOGRAPHIC (May 20, 2022), https://education.nationalgeographic.org/resource/caesar-crosses-rubicon/.

history and training as a combat veteran inherently means that Plaintiff poses more of a threat of inflicting physical violence against anyone, or would be any more prone to same.  Rather, it simply means that if this were to become Plaintiff's objective, she would be in a far superior position to achieve such an objective as compared to an untrained civilian.  Defendant's actions based on the perceived threat from Plaintiff must be viewed with Plaintiff's training and experience in mind. Finally, Defendant's conduct towards Plaintiff is wholly different than the physical abuse to which the plaintiff in *Hester* was subjected.

Plaintiff alleges "that she felt the effects of Ontiveros's treatment and isolation almost every day she reported to work . . . ."  (ECF No. 29 at p. 19).  "These allegations certainly establish that [Plaintiff] subjectively perceived her work environment to be hostile." *Milo*, 2022 WL 4447400 at *6 (the plaintiff alleged (1) the harassment was severe and pervasive, (2) the acts occurred frequently and were perpetuated by the same core groups of managers and employees, and (3) the plaintiff felt the impact of the conduct daily and felt both humiliation and despair).  However, although Plaintiff felt the effects of Defendant's conduct almost every day, there is no suggestion—other than the single time Ms. Collins critiqued Plaintiff's work—that Plaintiff's work performance suffered.  *Cf. Leonard*, 2022 WL 3867949 at *8–9 (although the "decision was close . . . ," the Court found that moving a plaintiff to an office directly at odds with a recommended accommodation, subjecting a plaintiff to increased work scrutiny, reprimanding a plaintiff for attending required doctor's appointments, reprimanding a plaintiff for not working on a day off, manually tampering with a plaintiff's recorded work hours, etc., was sufficient to plead a hostile work environment).  Rather, Plaintiff admits that she remained in her cubicle and focused on her work.  Considering all the circumstances, and the factors relevant in assessing those

circumstances, the Court finds that Plaintiff has failed to sufficiently plead a hostile work environment under Title VII.

Accordingly, the Court dismisses Count I without prejudice.

### C. Plaintiff Has Not Sufficiently Pleaded a Claim of Retaliation.

The Court cannot conclude that Plaintiff has sufficiently pleaded a claim for retaliation under Title VII. A claim for retaliation under Title VII has three elements: "(1) engagement in a protected activity; (2) adverse employment action; and (3) a causal link between the protected activity and the employment action." *Milo*, 2019 WL 4447400 at *8 (quoting *Coleman v. Md. Ct. of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010)) (other citations omitted). Regarding the second element, "[t]he definition of an adverse action is simply not reducible to a comprehensive set of clear rules[,] . . . [but] the provision's standard for judging harm must be objective." *Smith v. Vilsack*, 832 F. Supp. 2d 573, 585 (D. Md. 2011) (quoting *Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 175 (2011)) (internal quotation marks omitted). "Thus, an action is materially adverse if, from an objective point of view, 'it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Smith*, 832 F. Supp. 2d at 585 (quoting *Burlington N. Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006)). "As the Supreme Court reminded courts in *Burlington*, '[c]ontext matters' in retaliation cases." *Smith*, 832 F. Supp. 2d at 585 (quoting *Burlington*, 548 U.S. at 69). "Thus, it behooves courts to consider whether based upon the *combined effect* of alleged events, a reasonable worker could be dissuaded from engaging in protected activity." *Smith*, F. Supp. 2d at 585 (other citations and internal quotation marks omitted) (emphasis in original). However, "[t]he anti-retaliation provision of Title VII does not protect against petty slights, minor annoyances, and simple lack of good manners." *Id.* As to the third element, "[s]ince, by definition, an employer cannot take action because of a factor which it is

unaware, the employer's knowledge that the plaintiff engaged in protected activity is absolutely necessary to establish the third element of the prima facie case." *Id.* at 586 (quoting *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998)).

Here, Defendant challenges only whether Plaintiff has sufficiently pleaded the second and third elements of retaliation under Title VII. (ECF No. 25-1 at pp. 26–33). For clarification, the Court recognizes that the Amended Complaint alleges four potential instances of protected activity on which Plaintiff may be basing her claim for retaliation: (1) Plaintiff's August 3, 2016 complaint to Ms. Schauer concerning hostility exhibited by Mr. Lopez and Ms. Ontiveros, (2) Plaintiff's March 24, 2017 meeting with Mr. Montemerano, (3) Plaintiff's February 18, 2018 complaint to Ms. Augustine, and (4) Plaintiff's April 20, 2018 conduct and conversations leading to Plaintiff's placement on administrative leave on April 23, 2018. It is from these instances, presumably, that Plaintiff based her claim that she was subjected to "numerous adverse actions, including harassment, shunning, isolation, threats, false allegations, undue scrutiny, removal from Defendant's facilities, placement on administrative leave, issuance of a formal reprimand, removal of job duties, and other conduct that would reasonably dissuade an employee from engaging in protected conduct." (ECF No. 24 at p. 19, ¶ 105). Before analyzing each occurrence, the Court recognizes that "informal complaints about discriminatory treatment relating to a protected status constitute protected activity under Title VII . . . ." *Volochayev v. Sebelius*, 513 F. App'x 348, 354 (4th Cir. 2013) (internal citation omitted).

As to Plaintiff's August 3, 2016 complaint to Ms. Schauer, the Court recognizes that several instances of alleged adverse action occurred before Plaintiff spoke with Ms. Schauer, e.g., Mr. Lopez telling Plaintiff that DISA would not be sad if Plaintiff left, Ms. Ontiveros' perceived coldness towards Plaintiff, and Plaintiff's change in job duties. As such, those alleged actions

cannot be considered retaliatory.  Indeed, other than the issuance of approved TQSE to Plaintiff shortly after Plaintiff's conversation with Ms. Schauer, nothing in the Amended Complaint suggests that anyone other than Ms. Schauer ever knew of this conversation.  Furthermore, Plaintiff never alleges that Ms. Schauer treated Plaintiff in an unprofessional manner.

As to Plaintiff's March 24, 2017 meeting with Mr. Montemerano, there is no indication that Mr. Montemerano disclosed to anyone the fact that this conversation occurred.  Although Mr. Montemerano admitted to Plaintiff that he was uncomfortable around transgender people, it does not appear that Plaintiff is attempting to contort such an admission into an adverse employment action.  Even if Plaintiff did attempt as much, the Court cannot conclude such an admission to amount to anything more than perhaps bad manners, let alone an adverse employment action.  To the extent Plaintiff alleges that Ms. Ontiveros' use of the term "it" shortly after Plaintiff's conversation with Mr. Montemerano constitutes adverse employment action, this argument fails as well.  Regardless of the proximity of this reference to Plaintiff's conversation with Mr. Montemerano, such a slight, although certainly disrespectful and inappropriate, is insufficient to constitute retaliation.

As to Plaintiff's February 18, 2018 conversation with Ms. Augustine, Plaintiff strongly insinuates that Ms. Ontiveros learned of this conversation "[s]oon after . . . " it occurred.  (ECF No. 24 at p. 11, ¶ 59).  However, by the time this February 18, 2018 conversation occurred, Plaintiff had already experienced nearly two years of unprofessional treatment from certain co-workers. The Amended Complaint does not indicate that the conduct Plaintiff was already experiencing significantly escalated following this conversation.  Rather, the worst Plaintiff alleges to have occurred soon following this conversation was Ms. Ontiveros' refusal to transfer Plaintiff.  *Id.*

This brings the Court to Plaintiff's final claimed protected activity: Plaintiff's April 18, 2018 statements indicating her intent to file an EEO complaint.  Plaintiff focuses on the temporal proximity between what transpired on April 18, 2018, and Defendant's decision to place Plaintiff on administrative leave pending an investigation of the alleged threat Plaintiff made.  (ECF No. 29 at pp. 22–23).  However, two reasons prevent the Court from finding that Plaintiff has sufficiently pleaded retaliation based on this occurrence.  First, the Amended Complaint does not make clear what information was relayed to Defendant leading to Defendant's decision to place Plaintiff on administrative leave.  For example, Plaintiff used the phrase "cross the Rubicon" with DISA's chaplain and Ms. Martin.  Although Plaintiff maintains that the use of this phrase was meant to indicate that she would finally file an official EEO complaint, the Amended Complaint provides no indication as to whether Plaintiff actually expressed this meaning to the chaplain or Ms. Martin.  Following this, Plaintiff again said "cross the Rubicon" while speaking with Mr. Slindee and Ms. Washburn, but this time Plaintiff did specifically indicate that she was going to file an EEO complaint.  However, Plaintiff herself admits that the reason for her placement on administrative leave, which was disclosed to her on April 27, 2018, was that Defendant wanted to investigate her April 18, 2018 comment that management "would have a bad day on Monday[.]" (ECF No. 24 at p. 14, ¶ 73).  Plaintiff's Amended Complaint admits that Plaintiff was placed on administrative leave for her perceived threat regarding management.

Defendant's asserted rationale for placing Plaintiff on administrative leave pending an investigation into a perceived threat ties directly into the Court's second reason for finding that Plaintiff has not sufficiently pleaded retaliation based on her placement on administrative leave. Even assuming that this placement on administrative leave qualifies as an adverse employment action, the Court cannot conclude that Plaintiff has sufficiently pleaded her protected conduct to

be its cause.[5]  As indicated above, the Court cannot ignore Plaintiff's impressive and decorated history as a veteran of the Army Special Forces.  Therefore, Defendant's caution as it pertains to a perceived threat from Plaintiff appears perfectly reasonable and untainted by Plaintiff's disclosure to Mr. Slindee and Ms. Washburn concerning Plaintiff's EEO filing intent.  Furthermore, Plaintiff's attempt to argue pretext is unavailing.  Plaintiff merely asserts that "two non-transgender employees were alleged to have made threats of violence or even engaged in violence in the workplace.  Unlike [Plaintiff] neither was escorted off the premises."  (ECF No. 24 at p. 16, ¶ 81).  Plaintiff does not maintain that either employee to whom she refers have the combat experience and background of Plaintiff.  Additionally, Plaintiff does not allege that these other two employees were not placed on administrative leave.  Rather than take issue with the unknown fact of whether these other two employees were not placed on administrative leave, Plaintiff only takes issue with the fact that they were not escorted off the premises.  Such a difference in Plaintiff's situation does not change the Court's conclusion regarding the lack of causation between Plaintiff's protected activity and Plaintiff's placement on administrative leave.

Although the Court delineated and separately analyzed each protected activity upon which Plaintiff may base her claim for retaliation, the Court has considered the combined effect of all Plaintiff's allegations.  Just as the Court found that Plaintiff's allegations are not the stuff of which

---

[5] The Court also rejects the notion that Plaintiff's LOR constitutes an adverse employment action.  "Generally, a reprimand whether oral or written, does not *per se* significantly affect the terms or conditions of employment, but only becomes an adverse action if it works a real, rather than speculative, employment injury."  *Smith*, 832 F. Supp. 2d at 583 (other citations and internal quotation marks omitted).  Indeed, "the Fourth Circuit has also ruled that 'a letter of warning did amount to an adverse action because [plaintiff's supervisor] warned [plaintiff] that future disciplinary actions could result in further discipline, including termination.'"  *Prosa v. Austin*, No. ELH-20-3015, 2022 WL 394465, *33 (D. Md. Feb. 8, 2022)  (quoting *Barnes v. Charles Cty. Pub. Schools*, 747 Fed. App'x 11, 119 (4th Cir. 2018) (per curiam)).  Plaintiff's LOR charged Plaintiff with "Conduct Unbecoming" based on Plaintiff's perceived threat of violence.  Furthermore, the LOR reprimanded Plaintiff for the man-hours required for the investigation and the fact that Plaintiff's co-workers had to pick up Plaintiff's workload while Plaintiff was on administrative leave. However, Plaintiff has not alleged that the LOR mentioned a threat of future discipline, and it would not have dissuaded a reasonable worker from making an EEO complaint.

a hostile work environment claim is made, the Court similarly concludes that Plaintiff has failed

to establish that her allegations amount to retaliation under Title VII. *See Milo*, 2019 WL 4447400

at *8 (holding that the plaintiff's retaliation claim was not plausibly pleaded because the plaintiff's

hostile work environment and discriminatory termination claims failed).

Accordingly, the Court dismisses Count II without prejudice.

### D. *Plaintiff Has Sufficiently Pleaded a Claim of Impermissible Disclosure of Medical Documents Under the Rehabilitation Act.*

"Once an employee's medical information is legitimately obtained through employer

inquiries or examinations, that information must be 'treated as a confidential medical record.'"

*Katz v. U.S. Dep't of Just.*, No. 1:20-cv-554, 2021 WL 3809034, *6 (E.D. Va. Aug. 26, 2021)

(quoting 42 U.S.C. § 12112(d)(4)). "As an exception to the rule, 'supervisors and managers may

be informed regarding necessary restrictions on the work or duties of the employee and necessary

accommodations." *Katz*, 2021 WL 3809034 at *6 (quoting 42 U.S.C. § 12112(d)(4)).

Furthermore, "[a]s other courts have persuasively found, 'in order to state a claim under the

Rehabilitation Act's confidentiality provisions . . . a plaintiff must show that an unauthorized

disclosure of medical information resulted in a tangible injury." *Katz*, 2021 3809034 at *6 (quoting

*Koch v. Walter*, 935 F. Supp. 2d 164, 176 (D.D.C. 2013)) (other citation omitted); *see also Rohan*

*v. Networks Presentation, LLC.*, 175 F. Supp. 2d 806, 814 (D. Md. 2001) ("This disability

information may be disclosed only in limited circumstances to supervisors and managers . . . .")

(other citations omitted).

Here, Plaintiff requested a reasonable accommodation of reassignment to a position in

which Ms. Ontiveros would no longer be Plaintiff's supervisor. Plaintiff submitted supporting

documentation when initially making her request, and Plaintiff's provider submitted additional

documentation at the request of Defendant. Somehow Ms. Ontiveros gained access to the

documentation, and Ms. Ontiveros forwarded the documentation to her own supervisors and other employees who did not have a need to know about Plaintiff's reasonable accommodation request.[6] Defendant argues that everyone to whom Ms. Ontiveros forwarded the documents falls within the exception regarding supervisors and managers. (ECF No. 25-1 at pp. 33–34). The Court disagrees because such a pervasive reading of the exception would diminish the importance of the required confidentiality in the context of requesting reasonable accommodations, especially in the context of Plaintiff's case. The Amended Complaint establishes Ms. Ontiveros as Plaintiff's first and main harasser. Furthermore, the supervisors to whom Ms. Ontiveros presumably forwarded the documents—Mr. Lopez and Col. Lindeman—are both key players in Plaintiff's allegations of a poor working environment. Plaintiff has specifically alleged that none of these individuals had a need to know of Plaintiff's request for a reasonable accommodation, let alone a need to have access to the documents supporting that request. Furthermore, the Court cannot read the plain language of the exception as supporting the proposition that any manager or supervisor has a right to possess such documents. Rather, the plain language establishes only that supervisors and managers have the right to know of the necessary restrictions and accommodations; this does not automatically equate to having a right to know of the contents within the documents supporting such restrictions or accommodations.

The Court also disagrees with Defendant's contention that Plaintiff's claim fails "for the additional reason that she suffered no tangible harm from either email sent by Ms. Ontiveros."

---

[6] Defendant asserts that Ms. Ontiveros shared the documents with Mr. Lopez, Col. Lindeman, and Human Resource Representative, Gloria Glover. (ECF No. 25-1 at p. 34). Plaintiff's Amended Complaint only claims that Ms. Ontiveros sent the "medical records to employees who did not have a need to know about the request, including her supervisors." (ECF No. 24 at p. 17, ¶ 87). Construing the Amended Complaint in the light most favorable to Plaintiff, the Court recognizes the Amended Complaint to maintain that Ms. Ontiveros did not have a need to know of the documents, nor did anyone to whom Ms. Ontiveros forwarded the documents.

(ECF No. 25-1 at p. 34).  In *Koch*, the United States District Court for the District of Columbia

cited with approval the following observation from the Court of Appeals for the Third Circuit:

> Other courts of appeals have addressed the question [of] whether a plaintiff has a
> cause of action for a violation of § 12112(d) without demonstrating the existence
> of an injury-in-fact, either through actual damages (*emotional*, pecuniary or
> otherwise,) or through the presence of a continuing illegal practice to which
> plaintiff is likely to be subject absent court intervention.  All have concluded that a
> violation of § 12112(d), without such a showing, presents no 'injury' capable of
> remedy, and thus affords no basis for suit.

*Koch*, 935 F. Supp. 2d at 176 (quoting *Tice v. Centre Area Transp. Auth.*, 247 F.3d 506, 519–20

(3d Cir. 2001)) (other citations omitted) (emphasis added).  As such, in light of Plaintiff's

assertions that the disclosures to Ms. Ontiveros—and those to whom Ms. Ontiveros forwarded the

documents—caused Plaintiff exacerbated anxiety and shame, Plaintiff has sufficiently pleaded a

tangible injury.

Regarding Plaintiff's allegation that Ms. Ontiveros forwarded the documents to her

personal email, Plaintiff has not sufficiently pleaded her claim.  Even assuming that Ms. Ontiveros'

forwarding of the documents to her personal email constituted a violation of the Rehabilitation

Act's confidentiality provisions, Plaintiff has not alleged that she suffered a tangible harm as a

result.  Plaintiff specifically alleged that her tangible injury of shame and exacerbated anxiety arose

from the thought of others possessing Plaintiff's sensitive information.  Plaintiff, as should be

expected, has made no allegations that the act of someone impermissibly in possession of the

documents forwarding it to themselves somehow causes Plaintiff additional injury.  Furthermore,

regarding the emails Ms. Ontiveros allegedly sent to her husband, Plaintiff has made no allegation

that those emails contained the confidential documents at issue.  As such, Plaintiff's claim cannot

rely on the emails Ms. Ontiveros forwarded to herself or her husband.

Accordingly, to the extent Defendant seeks to dismiss Plaintiff's Count III on the grounds that Ms. Ontiveros and those to whom she forwarded the emails fit into the supervisor and manager exception, Defendant's Motion is denied.  To the extent Plaintiff's claim is based on the emails Ms. Ontiveros' sent to her own personal email account and to Ms. Ontiveros' husband, Defendant's Motion is granted.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiff's Motion (ECF No. 28) is granted to the extent Plaintiff's Count III remains, and Defendant's Motion (ECF No. 25), treated as a motion to dismiss, is granted without prejudice as to Counts I and II.  Defendant shall be permitted to again move for summary judgment on Count III following the close of discovery.  A separate order follows.


Date: <u>April 25, 2023</u>                              <u>          /s/          </u>
                                                        J. Mark Coulson
                                                        United States Magistrate Judge