## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

---

|  |  |  |
|---|---|---|
| STACY FAULKENBERRY | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:22-cv-01150-JMC |
| | ) | |
| LLOYD J. AUSTIN III, Secretary, | ) | |
| U.S. DEPARTMENT OF DEFENSE | ) | |
| | ) | |
| Defendant. | ) | |

---

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S
## MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED
## <u>COMPLAINT, OR IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT</u>

CORREIA & PUTH, PLLC
Subhashini Bollini (Bar No. 18343)
Lauren A. Khouri (Bar No. 19549)
1400 16th Street NW, Suite 450
Washington, D.C. 20036
Tel: (202) 602-6500
Fax: (202) 602-6501
sbollini@correiaputh.com
lkhouri@correiaputh.com

*Counsel for Plaintiff*

October 3, 2023

## <u>TABLE OF CONTENTS</u>

**Page**

FACTUAL BACKGROUND.................................................................................................... 1

STANDARD OF REVIEW................................................................................................... 11

ARGUMENT........................................................................................................................ 12

    I.      The Complaint Sufficiently Alleges a Hostile Work Environment Claim
           Based On Gender Identity.......................................................................................... 12

          A.  Plaintiff's Complaint describes in detail an environment pervaded by
              hostility because of gender identity........................................................... 14

          B.  Plaintiff's Complaint describes conduct far more pervasive than that
              in recent Fourth Circuit decisions describing a few similar facts........................... 17

    II.     Plaintiff Has Sufficiently Stated a Claim of Retaliation Under Title VII
           Standards................................................................................................................... 19

          A.  Defendant took materially adverse actions against Plaintiff................................ 20

          B.  Defendant took adverse actions against Plaintiff because of her
              protected activity........................................................................................ 21

    III.    Plaintiff's Complaint Sufficiently Describes a *Per Se* Violation of
           the Rehabilitation Act Confidentiality Provisions that Caused Plaintiff to
           Suffer Harm............................................................................................................... 23

CONCLUSION.................................................................................................................... 27

## FACTUAL BACKGROUND

Stacy Faulkenberry is a transgender woman who presents as female. By the time Ms. Faulkenberry began working for DISA, she had legally changed her name and gender markers to reflect that she is female. ECF No. 45, Plaintiff's Second Amended Complaint ("SAC") ¶ 11. She stands over six feet tall and her vocal range is tenor. *Id.* at ¶ 18. She served 25 years active duty in the U.S. Army, 15 years of which she served in the Army Special Operations community. *Id.* at ¶ 12. In June 2016, DoD directed Faulkenberry to transfer from her position with AFRICOM in Germany to DISA at Fort Meade, Maryland. *Id.* ¶ 16.

Before relocating from Europe to the U.S. to begin the job, Faulkenberry spoke by phone with her supervisor-to-be, Executive Officer of the Office of Chief of Staff, Sharon Ontiveros. *Id.* ¶ 21. Ontiveros exhibited a warm and welcoming tone as she discussed Faulkenberry's anticipated arrival. *Id.* ¶. When Faulkenberry told Ontiveros that she is a transgender woman, Ontiveros's tone shifted and became cold. *Id.* Ontiveros provided only curt responses to Faulkenberry's questions through the remainder of the call. *Id.*

Before Faulkenberry told Ontiveros she is transgender, DoD assigned Faulkenberry to the role of Tasker Workflow Manager, a position in the Office of the Chief of Staff of DISA. *Id.* ¶ 20. Before accepting the position, Faulkenberry reviewed the position description, which reflected that her primary job duties as Tasker Workflow Manager included managing the tasker system that DISA utilized to exchange information with the Office of the Secretary of Defense and the Joint Chiefs of Staff and briefing senior DISA leadership on workflow issues. *Id.* After Faulkenberry told Ontiveros she is transgender, and shortly after Faulkenberry reported to DISA, Ontiveros informed Faulkenberry that Faulkenberry would instead fill the role of "Issuance Manager." *Id.* ¶ 27-31. This job included none of the high-level communications work or interaction with

leadership that was entailed in the Tasker Workflow Manager position for which Faulkenberry was hired. *Id.* Moreover, the publications program duties required less training and were far less important; the priority of the work was so low that it had not been performed or even tended to over the preceding year. *Id.*

DISA management singled out Faulkenberry to show her from when she began work that she was unwelcome and not a member of the team. Faulkenberry understood DoD to allow 90 days for relocation overseas, but when Faulkenberry asked Ontiveros, Ontiveros directed Faulkenberry to report in 30 days. *Id.* ¶ 22. Faulkenberry requested Temporary Quarters Subsistence Expenses ("TQSE")—an allowance authorized by regulation to reimburse employees for costs of lodging, food, and other necessities when employees occupy temporary quarters at a new duty station—and Ontiveros said DISA "did not hire" Faulkenberry, did not want her, and should not have to pay her TQSE, and denied the request. *Id.* ¶ 25. Faulkenberry then went to Col. Mark Rosenstein, DISA Chief of Staff, and Andres Lopez, Deputy Chief of Staff, to request TQSE and both denied the request. *Id.*

Faulkenberry asked Lopez again and brought with her what she believed to be the governing regulations and Lopez responded that DISA "would not be sad" if Faulkenberry found a new job. *Id.* ¶ 32. Lopez falsely accused Faulkenberry of "dressing inappropriately for work," when Faulkenberry dressed in professional attire that was consistent with the clothing of other female employees in the workplace. *Id.* ¶ 58.

Faulkenberry first reported hostility from her supervisors less than one month into her job at DISA. On or about August 3, 2016, Faulkenberry reported to Deputy of Personnel Doria Schauer that Ontiveros and Lopez had treated her with hostility just days after she began working at DISA. *Id.* ¶ 34. Faulkenberry told Schauer that she did not observe management treating other employees

the way management treated Faulkenberry after learning about her gender identity and that management's actions made Faulkenberry feel isolated in the workplace. *Id.* ¶ 33-38.

After Faulkenberry reported discrimination to Schauer, Ontiveros all but stopped interacting with Faulkenberry in the workplace but continued to be collegial with other colleagues. *Id.* ¶ 39. Faulkenberry observed Ontiveros engage in face-to-face discussions with other employees about their work and even offer positive feedback to them, but Ontiveros said almost nothing to Faulkenberry. *Id.* Ontiveros engaged with Faulkenberry so little that it became obvious to Faulkenberry that Ontiveros was purposefully shunning her. *Id.* Ontiveros met with employees in her office multiple times throughout the day but rarely spoke to Faulkenberry in the workplace. *Id.* Moreover, when Faulkenberry attempted to engage with Ontiveros, Ontiveros would hastily end their interaction. *Id.* Ontiveros was dismissive toward Faulkenberry for the entire two-year period Faulkenberry reported to her. *Id.*

In October 2016, Faulkenberry learned that all other members of the Chief of Staff's team had been provided parking in a parking garage adjacent to the building in which they and Faulkenberry worked. *Id.* DISA Workflow Manager Chaneese Martin and Office Administrative Specialist Aysa Barbie, for instance, were given a parking pass and garage access on the day they began working in the Office of the Chief of Staff. *Id.* Ontiveros had authority to secure Faulkenberry a parking pass and knew that Faulkenberry was parking far from the building in which they worked; she and Faulkenberry had crossed paths multiple times while Faulkenberry was on her way to the building, which was 10 to 15 minute walk from where Faulkenberry had to park. *Id.* ¶ 43. It was not until Faulkenberry complained about being excluded from this benefit of employment that management obtained a parking pass for her. *Id.* ¶ 44. When Faulkenberry asked

Rosenstein why she had not previously been provided a parking pass as had other employees, Rosenstein responded, "It's not because you are transgender." *Id.* ¶ 47.

Ontiveros left Faulkenberry out of meetings that were relevant to her work and reassigned many administrative duties to Faulkenberry, even if those duties were outside of her job description. *Id.* ¶ 49-50. Ontiveros avoided eye contact with Faulkenberry and ignored Faulkenberry when they passed in the hallway. *Id.*

Ontiveros shunned Faulkenberry when it came to office social interactions, as well. Although the Office of the Chief of Staff routinely celebrated employees' birthdays by gathering together, engaging with one another, and doing a group sing-along of the birthday song, Ontiveros did not arrange a celebration for Faulkenberry during the first two years she worked at DISA. *Id.* ¶ 55. Faulkenberry observed that Ontiveros regularly went out to lunch with other women in the office. *Id.* ¶ 51. In November 2016, wanting to be part of the team, Faulkenberry approached Ontiveros and asked to be included in group lunch outings. *Id.* Ontiveros responded that Faulkenberry was not invited and would not want to go anyway because the lunches are "a girls thing." *Id*. Ontiveros made this comment to Faulkenberry in a shared open office space, and it was overheard by at least one coworker, Rebecca Clausen. *Id.* ¶ 52. Faulkenberry felt hurt and humiliated by Ontiveros's response. *Id.* ¶ 53. Clausen saw that Faulkenberry appeared hurt and embarrassed by what Ontiveros had said. *Id.* Faulkenberry understood Ontiveros's statement to mean both that she not welcome to be a part of the social life of the office, and that Ontiveros did not consider Faulkenberry to be female. *Id.* ¶ 54.

Ontiveros demeaned Faulkenberry in conversations with other employees. In March or April 2017, Ontiveros asked Clausen what she thought "it" was going to wear to work that day. When Clausen asked what she meant by "it," Ontiveros told her that "it" referred to "Stacy

[Faulkenberry]." *Id.* ¶ 62. Ontiveros mocked and displayed her disdain for Faulkenberry, forwarding an email thread to a coworker and stating "Ughhhhhh!" in pointing out that Faulkenberry had closed an email with "Warmest regards." *Id.* ¶ 63.

In March 2017, Faulkenberry met with the civilian DISA Executive Director Anthony Montemerano and described in detail management's treatment and how it made her feel isolated and humiliated. *Id.* ¶ 59. Faulkenberry asked to transfer to a different working unit to escape the hostility that Ontiveros and other employees were directing toward her. *Id.* ¶ 52. Faulkenberry went to DISA Human Resources to ask about open positions. *Id.* ¶ 66. Faulkenberry complained to Executive Officer Jennifer Augustine that Ontiveros had created a hostile work environment. Faulkenberry described to Augustine how Ontiveros was treating Faulkenberry and told her that the work environment was having a negative impact on her health. *Id.* ¶ 68. Faulkenberry requested a transfer. *Id.* Faulkenberry explained that unless the Agency did something to address the hostile work environment, she would be compelled to file a complaint to seek a remedy. *Id.* ¶ 68. Soon thereafter, Ontiveros told Faulkenberry she had heard that Faulkenberry reported being "unhappy" to management. *Id.*

In March 2018, Faulkenberry participated in a phone interview for a position with the DoD Joint Service Provider ("JSP") at the Pentagon. *Id.* ¶ 71. Faulkenberry believed the interview went very well. The interviewer started the interview by offering Faulkenberry a position that he described as primarily administrative. Faulkenberry responded that that was "not [her] cup of tea," and the interviewer then asked more about her skill set. *Id.* The interviewer said he had a position that involved stakeholder management and that he thought Faulkenberry would be a good fit for it. *Id.* He said he wanted Faulkenberry to start as soon as possible and that he would call DISA

Human Resources to work out the details. *Id.* Faulkenberry was relieved and excited by the prospect of working for a manager who might value her contributions and treat her fairly. *Id.*

Soon after the interview, Faulkenberry received a call from DISA Chief of Workforce Management Ava Marie Howard. *Id.* ¶ 72. Howard started the conversation by saying, "Sorry, Stacy – I think I messed up." *Id.* She described to Faulkenberry an earlier call that Howard had with the JSP interviewer, during which the interviewer repeatedly referred to Faulkenberry with male pronouns. *Id.* Howard corrected the interviewer and explained that Faulkenberry is transgender and wished to be referred to with female pronouns, "she/her." *Id.* Howard told Faulkenberry that after she shared this information with the interviewer, the tone of the phone call changed, and the interviewer exhibited disinterest in hiring Faulkenberry. *Id.* The interviewer never followed up with Faulkenberry, and the Joint Service Provider did not hire her.[1] *Id.* ¶ 73.

In April 2018, Faulkenberry was feeling hopeless about her work environment improving; she had reported her concerns to many people and tried to find ways to leave the Office of the Chief of Staff but felt like she was stuck in a situation that would not improve. *Id.* ¶ 76. On April 20, 2018, Faulkenberry told DISA's chaplain and Chaneese Martin that she was going to "cross the Rubicon,"[2] meaning she felt like she would finally move forward with filing an EEO complaint

---

[1]     Written correspondence from the interviewer (which Defendant attaches as an exhibit to its motion) refers to Faulkenberry with male pronouns and changed to female pronouns after another person emailed and used female pronouns to describe Faulkenberry. SAC ¶ 74.

[2]     The Court describes the historic origin of the phrase, "crossing the Rubicon." *See* ECF No. 33 at 25 n.4. The common, modern-day meaning of the phrase is "a step that definitely commits a person to a given course of action." *See* Britannica, Rubicon, *available at* https://www.britannica.com/place/Rubicon (last visited Oct. 3, 2023); *see also* Nat'l Geographic Soc'y, Jan *10, 49 BC: Caesar Crosses the Rubicon*, NAT'L GEOGRAPHIC (May 20, 2022), https://education.nationalgeographic.org/ resource/caesar-crosses-rubicon/. On dispositive motion, all inferences must be made in the non-movant's favor, and only a jury may resolve any dispute about Plaintiff's intent and meaning.

in hopes of finding a remedy for her ongoing mistreatment. *Id.* ¶ 77. She also told two protocol employees, Kellie Washburn and Scott Slindee, of her intent to file a complaint of discrimination based on gender identity with the Office of Special Counsel (OSC). *Id.* ¶ 78. Faulkenberry again used the phrase "cross the Rubicon" to refer to her finally filing a complaint after voicing her concerns about harassment for almost two years. *Id.* Anticipating that management would be upset when they learned she filed an EEO complaint, Faulkenberry told Washburn and Slindee, "Management is going to have a bad day on Monday," or similar words. *Id.* ¶ 79. Faulkenberry speculated to her coworkers that the OSC "would be dropping subpoenas everywhere," or something to that effect, after she filed a complaint. *Id.*

On the morning of Monday, April 23, 2018, Ontiveros called Faulkenberry into her office and told Faulkenberry that the agency was concerned about a "threat of violence" she had allegedly made, and that it was therefore placing Faulkenberry on administrative leave while the matter was investigated. *Id.* ¶ 84. Faulkenberry told Ontiveros she had not made any threat of violence. Faulkenberry explained she had told others that she intended to file a complaint of discrimination and harassment. Faulkenberry voiced concern to Ontiveros that the allegation she had threatened violence and the investigation into that allegation were discriminatory and retaliatory and part of a pattern of mistreatment by Ontiveros and others because of her gender identity. *Id.* ¶ 86. Still, DISA immediately placed Faulkenberry on leave, had security escort her through the building's main hallway to the exit, and took away her identification badge. *Id.* ¶ 87. Faulkenberry found this deeply humiliating to be escorted out of the office in front of her coworkers and accused of having threatened violence in the workplace. *Id.* ¶ 88.

On April 27, 2018, an official investigating the matter told Faulkenberry that the allegations were based on her comment that management would "have a bad day on Monday" – the comment

Faulkenberry made in reference to management's reaction upon learning she filed an EEO complaint of discrimination. *Id.* ¶ 89. Following its investigation, the Agency concluded that Faulkenberry had engaged in no wrongdoing, and it cleared her of any charge of having threatened workplace violence. *Id.* ¶ 91. Neither Washburn nor Slindee had characterized Faulkenberry's comments as a threat of violence. *Id.* ¶ 82. It was only after Ontiveros spoke with Washburn and Slindee and conferred with Addis that the Agency decided to subject Faulkenberry to an inquiry under its Violence in the Workplace policy. *Id.* Both Washburn's and Slindee's statements mention Faulkenberry's EEO activity. *Id.*; *see also id.* ¶ 80.

Faulkenberry spent two weeks isolated from her coworkers and unable to do her job duties while on administrative leave. *Id.* ¶ 90. During that time, Faulkenberry's mental and physical health deteriorated significantly. *Id.* When Defendant allowed Faulkenberry to return to work, she felt a great deal of stress, knowing that even her lighthearted social interactions with coworkers were under scrutiny from management. *Id.* ¶ 92-93. A colleague told Faulkenberry that while Faulkenberry was on administrative leave, he overheard a member of the security office saying that "because of an incident," Faulkenberry would not be coming back to the Agency. *Id.* Learning that such rumors had been discussed in her absence made Faulkenberry feel further isolated in the workplace. *Id.*

Notwithstanding the Agency's finding that Faulkenberry had not threatened violence, Ontiveros issued Faulkenberry a Letter of Reprimand ("LOR") on May 30, 2018, charging her with "Conduct Unbecoming." *Id.* ¶ 94. Ontiveros asserted in the LOR that Faulkenberry's comments made DISA employees feel "uncomfortable about [her] possible intentions towards [her] coworkers." Although the Agency elected to place Faulkenberry on administrative leave while it investigated her alleged threat of violence, Ontiveros reprimanded Faulkenberry for the

fact that coworkers had to assume her responsibilities while she was on leave. *Id.* Moreover, although the Agency itself elected to investigate the unfounded allegations against Faulkenberry, Ontiveros reprimanded Faulkenberry for the investigation having required "numerous man-hours being utilized by the inquiry official." *Id.* The LOR states that it could be relied upon as a basis for "additional disciplinary action, up to and including removal from federal service." *Id.* ¶ 96.

In the LOR, Ontiveros wrote, "I counseled you several times regarding my expectations of your professionalism at all times during your workday." *Id.* ¶ 95. DISA policy requires counseling prior to issuance of an LOR, but Ontiveros had not previously counseled Faulkenberry concerning workplace conduct or any other issue; Ontiveros's statement that she had done so was false. *Id.* Faulkenberry asked Ontiveros to provide her examples of other situations in which she had counseled employees on their professionalism; Ontiveros was unable to offer even one. *Id.* ¶ 80. When Faulkenberry repeated her concerns that Ontiveros was discriminating and retaliating against her, Ontiveros responded, "I'm still holding things on you." *Id.*

DISA treated other employees who had been accused of violating the workplace violence policy more favorably than it did Faulkenberry. For instance, two non-transgender employees were alleged to have made threats of violence or even engaged in physical violence in the workplace. *Id.* ¶ 99-102. Unlike Faulkenberry, neither was escorted off the premises. *Id.*

Faulkenberry suffered anxiety and increased stress due to the way Ontiveros and others treated her in the workplace. *Id.* ¶ 105. Her treating physician diagnosed her with Adjustment Disorder and recommended she be reassigned to a position in which Ontiveros would not be her supervisor. *Id.* ¶ 107. In June 2018, Faulkenberry submitted a request for a reasonable accommodation of reassignment and provided supporting medical documentation along with her request for reasonable accommodation. *Id.* The documentation stated that Faulkenberry began

treatment in April 30, 2018 – the time Agency forced her on administrative leave – and presented with symptoms of anxiety, depression, and sleep disturbances. *Id.* ¶ 109. Faulkenberry's provider indicated "[o]ne stressor that contributed to her symptoms was [Faulkenberry's] hostile work environment concerns." *Id*. The Agency personnel tasked with processing accommodation requests asked clarifying questions and Faulkenberry's provider submitted additional documentation stating that Faulkenberry's impairment because of depression, anxiety, and insomnia was severe. *Id.*

Faulkenberry followed agency policy and submitted her medical documentation through what she thought was a secure process. Yet, somehow, Ontiveros received the confidential records and then forwarded Faulkenberry's medical records to employees who did not have a need to know about the request, including her supervisors. *Id.* ¶ 110. Ontiveros also forwarded Faulkenberry's medical records to her personal web-based email account. *Id.* Ontiveros sent other emails about Faulkenberry, including emails about her complaints of discrimination and retaliation, to her personal email and to her husband's email. *Id.*

Learning that Ontiveros had disclosed her medical records to other employees and management officials who had no need to know of her diagnosed mental health condition exacerbated Faulkenberry's anxiety. *Id.* ¶ 109-111. She felt ashamed that Ontiveros and others had sensitive information about her mental health and knew that she was suffering from a condition that necessitated her seeking a reasonable accommodation. *Id.* Moreover, given that management had investigated Faulkenberry as a potential security threat to the office, she worried that disclosure of her diagnosis would create fodder for similar allegations. *Id.*

After a new Chief of Staff assumed the position in 2018, Faulkenberry was reassigned to a position outside of the supervision of Ontiveros. *Id.* ¶ 113. DISA left the Issuance Manager position vacant for two years after Faulkenberry was assigned to another position. *Id.* ¶ 114.

**STANDARD OF REVIEW**

A court may not dismiss a complaint pursuant to Rule 12(b)(6) if it contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The court must accept the well-pled allegations of the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Erickson v. Pardus*, 551 U.S. 89, 93 (2007); *DeMasters v. Carilion Clinic*, 796 F.3d 409, 416 (4th Cir. 2015). When weighing a civil rights complaint, the Court "must be especially solicitous of the wrongs alleged" and "must not dismiss the complaint unless it appears to a certainty that the plaintiff would not be entitled to relief under any legal theory which might plausibly be suggested by the facts alleged." *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999) (emphasis and citation omitted).[3] "A 'complaint' need not 'make a case' against a defendant or 'forecast evidence sufficient to prove an element' of the claim. *Robertson v. Sea Pines Real Estate Cos*., 679 F.3d 278, 291 (4th Cir. 2012) (citing *Chao v. Rivendell Woods, Inc*., 415 F.3d 342, 349 (4th Cir. 2005)). It need only 'allege facts sufficient to state elements' of the claim." *Id.*  In fact, under the 12(b)(6) standard, "a well-pleaded complaint

---

[3]    To separately address the portion of Defendant's motion that seeks summary judgment under Rule 56(a), Plaintiff moves for discovery pursuant to Rule 56(d). *See* ECF No. 54. Federal Rule of Civil Procedure 56(d) instructs that summary judgment should be denied when the nonmovant has not had the opportunity to discover information that is essential to her opposition. Defendant's motion rely on facts outside of the four corners of Plaintiff's Amended Complaint and asks the Court to accept as true numerous statements of its management witnesses without allowing Plaintiff the opportunity to take their depositions or seek related documents. "[T]he court does not consider extrinsic evidence at the motion to dismiss stage . . . ." *Reamer v. State Auto. Mut. Ins. Co.*, 556 F. Supp. 3d 544, 549 (D. Md. 2021) (internal citation omitted).

may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" *Woods v. City of Greensboro*, 855 F.3d 639, 652-53 (4th Cir. 2017) (citing *Twombly*, 550 U.S. at 556, internal quotes omitted).

## ARGUMENT

Plaintiff's Second Amended Complaint ("Complaint") sets forth sufficient facts to enable each of her three claims to proceed. Defendant asks the Court, however, to disregard not only its findings of sufficiency based on the previous iteration of the Complaint, but also new allegations which cure deficiencies identified in the Court's previous decision. *See* ECF No. 47-1 ("Def. Mem."). Defendant urges the Court to create a new pleading standard which accepts only facially obvious evidence of discriminatory or retaliatory animus but avoids any more sophisticated legal analysis that may be required to consider how circumstantial evidence may be a sufficient foundation upon which a claim can be built.

### I.   The Complaint Sufficiently Alleges a Hostile Work Environment Claim Based On Gender Identity

As an initial matter, Defendant argues that Plaintiff has not presented evidence showing that several management actions that comprise her hostile work environment claim have a discriminatory basis. It is true that no management official has thus far admitted to having treated Faulkenberry less favorably than other employees because she is transgender; however, as discovery is not yet complete, the claims as stated present circumstantial evidence of discriminatory animus and should not be dismissed. *See Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 141, 120 S. Ct. 2097, 2105 (2000) *citing Postal Service Bd. of Governors v. Aikens,* 460 U.S. 711, 716 (1983) (proof based on circumstantial evidence recognizes that "the question facing triers of fact in discrimination cases is both sensitive and difficult," and that "there will seldom be 'eyewitness' testimony as to the employer's mental processes.").

The Complaint identifies sufficient circumstantial evidence to support Faulkenberry's claim that Defendant – primarily through the *intentional* actions and omissions of Ontiveros – treated her less favorably than non-transgender employees and did so in a consistent and sustained manner such that the discriminatory conduct pervaded Faulkenberry's work environment. Opting to disregard relevant facts or consider facts supporting a hostile work environment claim in isolation, Defendant repeatedly characterizes Plaintiff's claims of discrimination as relying on "assumptions" of motive; the correct phrase is "reasonable inferences."

Defendant also urges the Court to disaggregate the factual allegations supporting Plaintiff's hostile work environment claim rather than reading them as a narrative from which inferences can be drawn. However, "[t]hese determinations depend on the totality of the circumstances, as [a] play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a discrimination analysis must concentrate not on individual incidents, but on the overall scenario." *DeMasters*, 796 F.3d at 417 (quoting *Moore v. City of Philadelphia*, 461 F.3d 331, 346 (3d Cir. 2006)). This is especially true of hostile work environment claims. *See AMTRAK v. Morgan*, 536 U.S. 101, 115 (2002) ("The 'unlawful employment practice…occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own." *See Harris* v. *Forklift Systems, Inc.,* 510 U.S. 17, 21 (1993) . . . "Such claims are based on the cumulative effect of individual acts."); *Conner v. Schrader-Bridgeport Int'l, Inc.*, 227 F.3d 179, 193 (4th Cir. 2000) (district court erred by analyzing plaintiff's hostile work environment evidence "in a disaggregated fashion, contrary to *Harris*'s 'totality of the circumstances' test.").

13

**A. Plaintiff's Complaint describes in detail an environment pervaded by hostility because of gender identity.**

Here, the Complaint describes such a pattern with sufficient detail that raises inferences of animus based on Plaintiff's gender identity. The Complaint alleges that Ontiveros's tone shifted dramatically from friendly to cold upon learning from Plaintiff that she is a transgender woman. SAC ¶ 21. The Court may draw from this a reasonable inference that Ontiveros's reaction to learning of Plaintiff's gender identity – as expressed through the change in her tone – was negative. This is not a fact to be considered as an isolated incident, but rather as evidence of animus that motivated Ontiveros's decisions regarding Plaintiff and her treatment of Plaintiff. Not long after the phone call in which Ontiveros's tone revealed her displeasure or discomfort at learning of Plaintiff's gender identity, Ontiveros told Plaintiff in a sharp tone of voice that DISA did not "want" Plaintiff. *Id.* ¶ 25. At this stage, it is reasonable to draw an inference that Ontiveros chose her words to convey that she did not want to work with Plaintiff. Because Ontiveros uttered these words in the context of denying Plaintiff's request for TQSE, Defendant asks the Court to look past Ontiveros's expression of animus and focus only on her denial of Plaintiff's request. Similarly, the Complaint alleges that Lopez not only initially denied Plaintiff's request but told her that DISA "would not be sad" if she found another job. *Id.* ¶ 32. These subtle indicators of management officials' animus merely set the stage for what was to come.

Ontiveros later diminished Plaintiff's job duties, assigning her primarily administrative duties that limited her interaction with others within and outside of the organization. *Id.* ¶¶ 27-29. *See Monegain v. Va. DMV*, 491 F. Supp. 3d 117, 144 (E.D. Va. 2020) (finding Equal protection claim sufficiently pled where employer moved transgender employee into less visible role, among other actions). Animus is further demonstrated by the preferred treatment received by similarly situated non-transgender employees. *Prosa v. Austin*, Civil Action No. ELH-20-3015, 2022 U.S.

14

Dist. LEXIS 23514, at *91-92 (D. Md. Feb. 8, 2022) ("[a]nimosity may be shown by 'differential treatment of similarly situated . . . employees'").

Ontiveros all but stopped engaging with Plaintiff in the workplace, both socially and on matters related to Plaintiff's work. *See, e.g.*, SAC ¶ 39-41, 51-53. Ontiveros humiliated Plaintiff directly by excluding Plaintiff from a "girls'" lunch by insinuating in an open workspace within earshot of others that Plaintiff is not a "girl." *Id.* ¶ 51-53. While not expressing her animus directly to Plaintiff, Ontiveros mocked Plaintiff's status as a transgender woman, referring to her by the inanimate pronoun "it" rather than "she," while discussing Plaintiff's workplace attire with Plaintiff's co-worker. *Id.* ¶ 62. Ontiveros also expressed general disdain for Plaintiff to another employee by emailing the reaction, "[S]he signed off on her email below with "Ughhhhhhhh!" to Plaintiff's email closing "Warmest Regards." *Id.* ¶ 64. Although the subject matter is petty, the fact is that Plaintiff's supervisor denigrating her in communications with a co-worker is objectively discriminatory conduct "aimed to humiliate, ridicule, or intimidate," and thereby create an abusive atmosphere. *EEOC v. Cent. Wholesalers, Inc.*, 573 F.3d 167, 176 (4th Cir. 2009) (*citing Jennings v. U.N.C.*, 482 F.3d 686, 695 (4th Cir. 2007) (en banc). Moreover, the email is evidence of Ontiveros's behind-the-scenes efforts to shun and isolate Plaintiff. Along these lines, Plaintiff alleges that she was dressed in professional attire similar to what other women were wearing in the workplace, but that Lopez singled her out in alleging that she was "dressing inappropriately for work." SAC ¶ 58.

The Complaint states that Ontiveros reassigned Plaintiff to strip her of higher-profile and more desirable job duties that would allow her to interact with DoD leadership and provide opportunities for career advancement. Although Ontiveros did not directly reveal that she stripped Plaintiff of these job duties because of Plaintiff's transgender status, Ontiveros deviated from

normal protocol in taking this personnel action, thus raising an inference that she acted based on an unlawful motive. *Palomino v. Concord Hosp. Enters. Co.*, 126 F.Supp.3d 647, 655 (D.S.C. 2015) (citing *Vaughan v. Metrahealth Companies, Inc.*, 145 F.3d 197, 201 (4th Cir. 1998)) ("[a] deviation from normal business practices can illustrate pretext.")

Finally, the Complaint alleges facts that allow one to infer that Ontiveros influenced the decision to treat Plaintiff's comments about "crossing the Rubicon" as a threat of workplace violence, although a written description of the incident described no actual threat of violence, but rather Plaintiff's plan to file a complaint against her supervisors. SAC ¶¶ 77-85. Although Plaintiff is "not required as a matter of law to point to a similarly situated . . . comparator in order to succeed' on a discrimination claim," *Laing v. Fed. Express Corp.*, 703 F.3d 713, 720 (4th Cir. 2013) (quoting *Bryant v. Aiken Reg'l Med. Ctrs., Inc.*, 333 F.3d 536, 545 (4th Cir. 2003)), the Complaint states that non-transgender comparators in Ontiveros's organization who had actually engaged in violence or threatened violence were not subjected to investigation, as Plaintiff was. *Id.* ¶¶ 101-105. Ontiveros then exercised her discretion to issue Plaintiff a Letter of Reprimand for alleged "Conduct Unbecoming." *Id.* ¶ 94. The Complaint suggests that the rationale for the Letter of Reprimand is pretextual, as Ontiveros falsely claimed to have previously counseled Plaintiff on her conduct. *Id.* ¶ 95.

In assessing whether the environment "was objectively severe or pervasive," courts "must look at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id* (quoting *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008)). *See EEOC v. Cent. Wholesalers, Inc.*, 573 F.3d 167, 176 (4th Cir. 2009) ("[N]o single factor is' dispositive, *Harris*, 510 U.S. at 23, as '[t]he real

16

social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed,' *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 82 (1998)."). The plaintiff must have subjectively perceived the environment to be hostile or abusive. *Parker v. Reema Consulting Servs.*, Civil Action No. TDC-17-1648, 2021 U.S. Dist. LEXIS 92763, at *14 (D. Md. May 17, 2021). Here, Plaintiff reported to management officials, medical professionals, co-workers, and her chaplain that she was struggling because of her supervisor's hostile treatment of her in the workplace. *See Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 185-86 (4th Cir. 2001) (finding that a victim's complaints to supervisors about harassment shows he or she believed the environment was hostile or abusive). The fact that Ontiveros, Faulkenberry's supervisor, is the alleged harasser and openly demeaned Faulkenberry in front of colleagues, makes the environment all the more severe and pervasive. "[A] supervisor's power and authority invests his or her harassing conduct with a particular threatening character." *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 278 (4th Cir. 2015) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 763 (1998).

Lastly, a plaintiff may establish a hostile work environment claim by asserting that the environment was "psychologically injurious." *See Harris*, 510 U.S. at 22. Here, Plaintiff pleads she suffered anxiety and stress due to the way Ontiveros and others treated her, so much so that her treating physician diagnosed her with Adjustment Disorder and Plaintiff sought reasonable accommodation. *See* SAC ¶¶ 107-109.

### B. Plaintiff's Complaint describes conduct far more pervasive than that in recent Fourth Circuit decisions describing a few similar facts.

Two recent decisions in this circuit, *Milo v. Cybercore Techs., LLC*, Civil Action No. RDB-18-3145, 2019 U.S. Dist. LEXIS 160386 (D. Md. Sep. 17, 2019) and *Hooten v. Walmart Inc.*, No.

5:20-CV-697-BO, 2021 U.S. Dist. LEXIS 63833 (E.D.N.C. Apr. 1, 2021) addressed claims of hostile work environment based on an employee's identity as transgender. Although the basis and type of claims are the same as Plaintiff's, a closer look at the underlying facts distinguishes these cases, in which courts determined that the hostile work environment claims failed to meet the standard for severe or pervasive conduct.

In *Milo*, unlike in Plaintiff's case, the hostile work environment claim is primarily comprised of a series of workplace incidents related to complaints by co-workers who feared the consequences of potentially misgendering Milo. *Milo*, 2019 U.S. Dist. LEXIS at *4-6. Indeed, some of the facts suggest disparate treatment, but the incidents described are few and far between, unlike Plaintiff's claim, which describes an environment in which her direct supervisor, Ontiveros, was outwardly hostile toward Plaintiff to the extent that, among other things, she almost completely excluded Plaintiff from professional and social workplace interactions for nearly two years; dehumanized Plaintiff by calling her "it"; directly told Plaintiff she doesn't consider Plaintiff a female co-worker; diminished Plaintiff's career prospects by stripping her of job duties; and tarnished Plaintiff's professional reputation by investigating her for an alleged threat of workplace violence and issuing a formal Letter of Reprimand that remained in Plaintiff's personnel file for two years and could have been relied upon for more severe disciplinary actions, up to and including termination.

*Hooten* also describes claims involving the plaintiff's supervisor; however, the conduct described is nowhere near as pervasive as what Faulkenberry describes in her Complaint. What is described, rather, are a few slights such as eye rolling, similarly dehumanizing use of the word "it" to refer to Hooten, and criticism of her work. *Hooten*, 2021 U.S. Dist. LEXIS at *6-9. The similarities are few, but there is no denying that Faulkenberry was subjected to a hostile work

environment that was objectively far more pervasive, carried on daily for a two-year period, that interfered with her work, and that caused her significant emotional distress.

## II.    Plaintiff Has Sufficiently Stated a Claim of Retaliation Under Title VII Standards

To state a claim for retaliation, Plaintiff must show that (1) she engaged in a protected activity, (2) the employer took an adverse employment action against her, and (3) there was a causal connection between the protected activity and the asserted adverse action. *Jones-Davidson v. Prince George's County Cmty. College*, 2013 U.S. Dist. LEXIS 159422, *10 (D. Md. Nov. 7, 2013) (citing *Laughlin v. Metro. Wash. Airports Auth*., 149 F.3d 253, 258 (4th Cir. 1998)). The adverse action must be an action that could dissuade a reasonable person from complaining about discrimination. *See Maron v. Va. Polytechnic Inst. & State Univ*., 508 F. App'x 226, 230 (4th Cir. 2013) (citing *Burlington Northern & Santa Fe Ry. v. White*, 548 U.S. 53 (2006)). Here, the Complaint describes Plaintiff's having reported her concerns about discrimination to three management officials, Schauer, Montemerano, and Augustine; to the Chaplain, and three co-workers, Martin, Washburn, and Slindee; and directly to Ontiveros when told by Ontiveros of the investigation into an allegation of violence in the workplace and later again when Ontiveros issued the Letter of Reprimand. Although Plaintiff did not voice concerns about discrimination to Col. Rosenstein, he perceived her question of why she was not issued a parking placard as protected activity, preemptively responding that management's failure to issue the placard was *not* because she is transgender. *See Jordan v. Evans*, No. 15 C 5907, 2019 U.S. Dist. LEXIS 153559, at *30-31 (N.D. Ill. Sep. 9, 2019) (citing cases in support of proposition that "specific, unsolicited denials of retaliatory motive [can be considered] evidence that there *was* a retaliatory motive").

Defendant concedes that Plaintiff engaged in protected activity. *See* Def. Mem. at 28-31. A short time after engaging in instances of protected activity, as described below, she was subjected to an intensified hostile work environment and later investigated for allegations of threats of

workplace violence and issued a Letter of Reprimand.  Plaintiff has met the standards to survive a motion to dismiss and Defendant's motion should be denied.

### A.  Defendant took materially adverse actions against Plaintiff.

To establish an adverse employment action, a plaintiff only needs to show that the action was materially adverse; that the action "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington*, 548 U.S. at 68 (cleaned up). Courts may consider the "combined effect of alleged events" when employing the reasonable person standard. *Smith v. Vilsack*, 832 F.Supp.2d 573, 585 (D. Md. 2011) (internal citations omitted). Where a hostile work environment is alleged to have been motivated by retaliatory animus, the Fourth Circuit has determined that the conduct need only be so severe or pervasive "that it would dissuade a reasonable worker from making or supporting a charge of discrimination." *Laurent-Workman v. Wormuth*, 54 F.4th 201, 217 (4th Cir. 2022). This is consistent with the goal of Title VII's anti-retaliation provision "to provide broad protection from retaliation." *DeMasters v. Carilion Clinic*, 796 F.3d 409, 418 (4th Cir. 2015) (quoting *Burlington N.*, 786 F.3d at 67) (internal quotation omitted).

The Complaint alleges that Defendant subjected Plaintiff to numerous adverse actions. Viewed in totality, these actions are sufficiently adverse to state a claim of a retaliatory hostile work environment. *See Engler v. Harris Corp.*, Civil Action No. GLR-11-3597, 2012 U.S. Dist. LEXIS 122167, at *26-28 (D. Md. Aug. 28, 2012) (referencing adverse actions such as being excluded from meetings where plaintiff's work was discussed); *Burlington*, 548 U.S. at 69; *Laurent-Workman v. Wormuth*, 54 F.4th 201, 216-18 (4th Cir. 2022) (materially adverse where employer engaged in unpredictable management decisions and alleged acts of sabotage).

Defendant's investigating Faulkenberry for an alleged threat of violence, its escorting her out of the workplace, and its issuing her a Letter of Reprimand, are each also actions that independently would dissuade a reasonable person from engaging in protected activity, and thus also constitute stand-alone adverse actions. The Letter of Reprimand by itself is an adverse action. *See Prosa v. Austin*, Civil Action No. ELH-20-3015, 2022 U.S. Dist. LEXIS 23514, at *80-82 (D. Md. Feb. 8, 2022) (citing *Barnes v. Charles Cty. Pub. Schools*, 747 Fed. App'x 115, 119 (4th Cir. 2018) (per curiam)) ("the Fourth Circuit has also ruled that 'a letter of warning did amount to an adverse action because [plaintiff's supervisor] warned [plaintiff] that future disciplinary actions could result in further discipline, including termination'"). The threat of suspension, termination, or further discipline is enough to survive a motion at this stage. *Prince-Garrison v. Md. Dep't of Health & Mental Hygiene*, 317 F. App'x 351, 355 (4th Cir. 2009) (reversing dismissal of plaintiff's complaint where allegations of threats of suspension and termination sufficiently pleaded adverse actions to survive a motion to dismiss). Plaintiff sufficiently pleads Defendant took adverse actions.

**B. Defendant took adverse actions against Plaintiff because of her protected activity.**

The Complaint states sufficient facts from which it can be inferred that Defendant was aware of Plaintiff's protected activity and took adverse actions against her because of her protected activity. Causation can be shown in two ways: by "show[ing] that the adverse act bears sufficient temporal proximity to the protected activity," or by showing "the existence of facts that suggest that the adverse action occurred because of the protected activity," or a combination of the two. *Laurent-Workman,* 54 F.4th  218-19, (citing *Smith v. CSRA*, 12 F.4th 396, 417 (4th Cir. 2021) (cleaned up)).

Plaintiff reported to Doria Schauer on August 3, 2016 that Ontiveros and Lopez were discriminating against her. SAC ¶¶ 34-35. Upon information and belief, Lopez and Ontiveros quickly approved Plaintiff's TQSE request soon thereafter because of Plaintiff's complaint to Schauer. *Id.* ¶¶ 37-38. Next, Ontiveros began displaying greater hostility toward Plaintiff and "all but stopped interacting with Faulkenberry in the workplace" while continuing to be collegial with other employees. *Id.* ¶ 39. The difference in Ontiveros's conduct toward Plaintiff was stark; she "said almost nothing to Faulkenberry" but met with other employees in her office "multiple times throughout the day." *Id.* When Faulkenberry attempted to engage with Ontiveros, Ontiveros would hastily end their interaction. *Id.* This marked shift in Ontiveros's conduct toward Faulkenberry gives rise to an inference that Ontiveros learned of Faulkenberry's complaint and began to retaliate against Faulkenberry. *See Prince-Garrison*, 317 F. App'x at 355 (considering plaintiff's allegation that she was treated with hostility following protected activity in reversing district court's grant of defendant's motion to dismiss). Ontiveros then did not issue Faulkenberry a parking placard, despite her knowing that Faulkenberry was entitled to one as were all other employees in the office, until Faulkenberry complained in October 2016 of not having been issued a placard. It was at this time that Col. Rosenstein assumed Plaintiff was about to voice concerns about gender discrimination and pre-empted her by denying any discriminatory motive. SAC ¶ 47. It would be reasonable to infer that Rosenstein discussed the possibility with Ontiveros and Lopez that their not issuing Plaintiff a parking placard could give rise to a discrimination complaint. Around this time, Lopez singled out Plaintiff and alleged that she – but not any of the other women in the office who dressed similarly – was "dressing inappropriately for work." *Id.* ¶ 57. Ontiveros continued to shun Plaintiff in the office, and when Plaintiff asked in November 2016 to join a lunch outing with other women, Ontiveros suggested to Faulkenberry in an open work area in front of others that she

is not a woman and therefore would not want to join the "girls" for lunch. *Id.* ¶ 51. Ontiveros and other managers also decided in November 2016 to reassign additional significant administrative job duties from another employee to Plaintiff, further marginalizing Plaintiff's role in the office. Ontiveros continued to shun and isolate Plaintiff, excluding her birthday from birthday celebrations that Ontiveros arranged for other members of the office. *Id.* ¶ 55. She mocked Plaintiff's gender identity and dress in conversation with Rebecca Clausen. *Id.* ¶ 61. Plaintiff continued to voice her concerns to management officials in hopes of finding a means for reassignment to a different supervisory chain. Ontiveros learned of Plaintiff's complaint to Executive Officer Jennifer Augustine in February 2018 and confronted Plaintiff with that knowledge. *Id.* ¶ 68-70. By April 2018, Plaintiff was losing hope that the Agency would remedy her concerns, so she began sharing her concerns about the hostile work environment she faced with the DISA chaplain, Martin, Washburn and Slindee. *Id.* ¶¶ 76-79. Plaintiff clearly stated her intent to file a complaint of discrimination against her supervisors, and Washburn and Slindee conveyed Plaintiff's intent to engage in protected activity to Ontiveros and Addis when they reported their conversation with Plaintiff. *Id.* ¶¶ 79-83. Moreover, they did not claim Plaintiff stated an actual threat of violence. *Id.* Ontiveros disregarded this information and either made the decision or was involved in the decision to characterize Faulkenberry's comments about filing a complaint as a threat of violence. *Id.* ¶ 85.

Defendant permitted Plaintiff to report to the workplace the following Monday, then notified her that she was being investigated for an alleged threat of violence and being placed on administrative leave. *Id.* Plaintiff denied having alleged a threat of violence and explained to Ontiveros that she had told Washburn and Slindee of her plan to file a complaint of discrimination against Ontiveros. *Id.* ¶ 86. Plaintiff also told Ontiveros she believed that the false allegation she

had threatened violence and the investigation into that allegation were part of a part of Ontiveros's continuing pattern of discrimination and retaliation. *Id.* DISA had Plaintiff escorted out of the office by security officials. *Id.* ¶ 87. The decision to investigate Plaintiff's alleged threat of violence was discretionary and made in retaliation for her having voiced her intent to file a complaint of discrimination.

Moreover, the separate decisions to place Plaintiff on administrative leave and escort her out of the building were both unnecessary given the information Ontiveros and Addis had about Plaintiff's stated intent; at this early stage, Plaintiff sufficiently pleads that this decision was also motivated by retaliatory animus. Other employees who had been accused of violating the workplace violence policy were treated more favorably and not escorted off the property when they were accused of making threats of violence or engaging in violence in the workplace. Deviation from policy is evidence of pretext. *See Alvarado v. Bd. of Trustees of Montgomery Community College*, 928 F.2d 118, 122-23 (4th Cir. 1991) (departure from employer policies supports a showing of pretext).

Defendant appears to miss Plaintiff's claim that the Letter of Reprimand was retaliatory. When Ontiveros issued the letter, she and other managers were aware of Plaintiff's stated intent to file a complaint of discrimination, even if she did not know that Plaintiff had already filed in early May. Plaintiff had also confronted Ontiveros directly on April 23, 2018 with her concerns that the allegations Plaintiff had threatened violence and the decision to investigate those false allegations were discriminatory and retaliatory. Ontiveros issued the Letter of Reprimand on May 20, 2018; the letter falsely alleged that Ontiveros had "previously counseled [Plaintiff] several times" regarding her professionalism. *Id.* ¶ 95. Ontiveros's false justification for issuing a Letter of Reprimand is evidence that her rationale is pretext for an unlawful retaliatory motive.

Plaintiff has alleged with sufficient and compelling detail her claims of retaliation and a retaliatory hostile work environment.

### III.   Plaintiff's Complaint Sufficiently Describes a *Per Se* Violation of the Rehabilitation Act Confidentiality Provisions that Caused Plaintiff to Suffer Harm.

Defendant violated the Rehabilitation Act when it shared with employees without a need to know Plaintiff's medical information submitted to support her accommodations requests. By incorporating the relevant sections of the ADA,[4] the Rehab Act requires an employer to keep confidential medical information an employee provides in response to employer-made "inquiries into the ability of an employee to perform job-related functions." 42 U.S.C. § 12112(d)(4)(B) & (C). That provision applies to an agency's request for medical information to support an employee's request for reasonable accommodations. *See Cripe v. Mineta*, No. 03-2206 (RWR), 2006 U.S. Dist. LEXIS 44398, at *14-18 (D.D.C. June 29, 2006); 29 C.F.R. §1630.14(c) (2016). As an exception to this requirement, an agency may share such information with a limited group of people: supervisors and managers in *limited circumstances*, first aid and safety personnel, and government officials investigating ADA compliance. *See* 42 U.S.C. § 12112(d)(3)(B); 29 C.F.R. §1630.14(c) & (c)(1). Plaintiff pleaded that Defendant violated the confidentiality provisions of the Rehab Act by sharing Plaintiff's medical information with employees who did not have a need to know such information.

Defendant contends that Ontiveros and each of the other management officials to whom she forwarded Plaintiff's medical records had a need to know of their contents. Def. Mem. at 34. Defendant offers no testimony, email, document, policy, procedure, or other evidence to support

---

[4]   *See* 29 U.S.C. § 791(f) (incorporating ADA, 42 U.S.C. § 12111 into the Rehab Act); 29 C.F.R. § 1614.203(b) ("The standards used to determine whether Section 501 has been violated in a complaint alleging employment discrimination under this part shall be the standards applied under the ADA").

this bald assertion.[5] It offers no explanation as to why Ontiveros needed to know about Plaintiff's medical condition in order to consider Plaintiff's requested reasonable accommodation of reassignment, and it offers no rationale for Ontiveros's forwarding such sensitive information to Plaintiff's second- and third-line supervisors or others. Defendant also does not address the fundamental problem with Ontiveros's forwarding Plaintiff's medical records to a personal web-based email account; Defendant no longer maintains control of these files and therefore cannot attest that they remain confidential. *See* SAC ¶¶ 110.  Plaintiff has offered sufficient facts for her claim to proceed as articulated.

Defendant further mistakenly contends Plaintiff did not suffer "tangible harm" from the unlawful disclosure of her medical information; what appears to be a carry over from Defendant's first and second dispositive motions, even though Plaintiff amended her Complaint to make the harm clear. Def. Mem. at 34-35. Plaintiff's Complaint pleads that Ontiveros's disclosure of her medical records to "msn.com" and "verizon.net" personal email accounts created a risk of further disclosure of Faulkenberry's confidential medical information because neither web-based email account is a secured platform that the Agency's email server employs. SAC ¶ 110. Plaintiff's Complaint also pleads that when Faulkenberry learned others outside of the reasonable accommodation process knew of her diagnosed mental health condition, it exacerbated her anxiety. SAC ¶ 88. Faulkenberry felt ashamed knowing that Ontiveros and others had sensitive information about her mental health and that she was suffering from a condition that necessitated her seeking a reasonable accommodation. *Id.* "Shame, embarrassment and depression" suffered by employee as a result of unauthorized medical disclosure satisfies the "tangible injury" requirement under the ADA's confidentiality provisions." *Koch v. Walter*, 935 F. Supp. 2d 164, 176 (D.D.C. 2013). *See*

---

[5]     Plaintiff's Rehab Act claim was not part of discovery before the EEOC.

*also EEOC v. Ford Motor Credit Co.*, 531 F. Supp. 2d 930, 941-43 (M.D. Tenn. 2008) ("Mr. Doe suffered shame, embarrassment, and depression as a result of the disclosure of his HIV status to his coworkers. These are tangible injuries."); *Shoun v. Best Formed Plastics, Inc.*, 28 F. Supp. 3d 786, 790 (N.D. Ind. 2014) ("he suffered emotional injury, . . . [had] been recognized as [a] tangible injur[y] under the ADA"); *Stamat v. Grandizio Wilkins Little & Matthews, LLP*, No. SAG-22-00747, 2022 U.S. Dist. LEXIS 158224, at *19-20 (D. Md. Aug. 31, 2022) ("emotional injuries may suffice"); *Alston v. Freedom Plus/Cross River*, Civil Action No. TDC-17-0033, 2018 U.S. Dist. LEXIS 20354, at *22-23 (D. Md. Feb. 7, 2018) (allegation of "mental anguish and emotional distress" sufficient to state tangible harm element at this stage). Defendant's motion fails.

## CONCLUSION

Plaintiff respectfully requests the Court deny Defendants' Motion to Dismiss the Amended Complaint, or in the Alternative, for Summary Judgment.

Date: October 3, 2023                         Respectfully submitted,

                                              CORREIA & PUTH, PLLC

                                                  */s/ Lauren A. Khouri*
                                              Subhashini Bollini (Bar No. 18343)
                                              Lauren A. Khouri (Bar No. 19549)
                                              1400 16th Street NW, Suite 450
                                              Washington, D.C. 20036
                                              Tel: (202) 602-6500
                                              Fax: (202) 602-6501
                                              sbollini@correiaputh.com
                                              lkhouri@correiaputh.com

                                              *Counsel for Plaintiff*

## **CERTIFICATE OF SERVICE**

I hereby certify that on October 3, 2023, a true and accurate copy of the foregoing document was electronically filed with the Clerk of Court using the CM/ECF system, which will send a notification of the filing to all counsel of record.

*/s/ Lauren A. Khouri*
Lauren A. Khouri (Bar No. 19549)
