## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

STACY FAULKENBERRY,                          *

    *Plaintiff,*                             *

    v.                                     *          Civil Case No: 1:22-cv-01150-JMC

LLOYD J. AUSTIN, III,
**Secretary of Defense,**
**United States Department of Defense,**

                              *

    *Defendant.*

    *     *     *     *     *     *     *     *     *     *     *     *

### MEMORANDUM OPINION

Plaintiff, Stacy Faulkenberry, filed suit against Defendant, U.S. Department of Defense, on May 12, 2022.  (ECF No. 1).  On December 15, 2022, Plaintiff filed an Amended Complaint alleging three counts: (1) Hostile Work Environment Based on Sex and Gender Identity in Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e, as amended ("Title VII"); (2) Retaliation in Violation of Title VII; and (3) Violation of Confidentiality Provisions of the Rehabilitation Act of 1973, 29 U.S.C. § 701, as amended.  (ECF No. 24 at 18–20).[1]  This Court then granted in part and denied in part Defendant's motion to dismiss the Amended Complaint or, in the alternative, for summary judgment, dismissing Counts I and II in their entirety without prejudice, and partially dismissing Count III.  *See generally Faulkenberry v. U.S. Dep't of Def.*, No. 1:22-CV-01150-JMC, 2023 WL 3074639 (D. Md. Apr. 25, 2023).  The Court also granted Plaintiff's motion for discovery pursuant to Rule 56(d) at that time to the extent Plaintiff sought discovery as to Count III.  *Id.*  Plaintiff then filed her Second Amended Complaint on August 25, 2023.  (ECF No. 45).  Presently before the Court are two motions: (1) Defendant's Motion to

---

[1] When the Court cites to a specific page number or range of page numbers, the Court is referring to the page numbers provided in the electronic filing stamps located at the top of every electronically filed document.

Dismiss for Failure to State a Claim or, in the Alternative, for Summary Judgment (ECF No. 47); and (2) Plaintiff's Motion for Discovery Pursuant to Rule 56(d) (ECF No. 54).  The Court has considered the parties' oppositions and replies thereto regarding both motions.  (ECF Nos. 55, 59, 60, 61).  No hearing is necessary.  *See* Loc. R. 105.6 (D. Md. 2023).  For the reasons that follow, Defendant's motion, treated as a motion to dismiss, is granted in part and denied in part. Additionally, Plaintiff's motion is denied as moot.

## I.   BACKGROUND

Plaintiff is a transgender woman who presents as a female and has legally changed her name and gender markers to reflect that she is female.  (ECF No. 45 at 4).[2] Plaintiff is a Bronze Star recipient, "decorated Army Special Forces combat veteran" who served twenty-five years active duty in the U.S. Army before being honorably discharged in October 2009.  *Id.* at 1, 4.  After her discharge from active military service, Plaintiff began working for the U.S. European Command, which is part of the U.S. Department of Defense, in Stuttgart, Germany, in October 2009.  *Id.* at 4.  Defendant subsequently ordered Plaintiff's transfer from Germany to a position with the Defense Information Systems Agency ("DISA") at Fort Meade, Maryland, in June 2016. *Id.* at 5.  Plaintiff presented as a female at the time of her transfer to DISA, although she is over six feet tall and she has not undergone surgery for vocal feminization such that her vocal range remains as that of a stereotypical male according to her Second Amended Complaint.  *Id.* Defendant initially assigned Plaintiff to the role of Tasker Workflow Manager, in which Plaintiff would manage "the tasker system that DISA utilized to exchange information with the Office of the Secretary of Defense and the Joint Chiefs of Staff and briefing senior DISA leadership on

---

[2] At the motion to dismiss stage, the Court "accept[s] as true all well-pleaded facts and construe[s] them in the light most favorable to the plaintiff."  *Harvey v. Cable News Network, Inc.*, 48 F.4th 257, 268 (4th Cir. 2022).

workflow issues." *Id.* Plaintiff eagerly accepted the position because she understood that "working closely with leadership would provide her with an opportunity for professional growth and advancement." *Id.* at 7.

Prior to Plaintiff's relocation from Germany to Fort Meade, Plaintiff spoke with her supervisor-to-be, Sharon Ontiveros, by phone. *Id.* at 5. Although Ontiveros initially exhibited a warm and welcoming tone to Plaintiff as they discussed Plaintiff's anticipated arrival, Ontiveros' tone shifted and became cold once Plaintiff informed Ontiveros that Plaintiff is a transgender woman. *Id.* Ontiveros' shift in tone was followed by "curt responses to [Plaintiff's] questions through the balance of the call" and Ontiveros denying Plaintiff's requested 90-day moving allowance, which Plaintiff understood to be "the typical timeframe for relocation of overseas new hires." *Id.* at 5–6. Ontiveros instead directed Plaintiff to report to her new workplace within thirty days. *Id.* at 6.

Plaintiff reported to DISA on July 21, 2016, where she met with Ontiveros to discuss her new role and request "Temporary Quarters Subsistence Expenses," which is "an allowance authorized by regulation to reimburse employees for costs of lodging, food, and other necessities when employees occupy temporary quarters at a new duty station." *Id.* Ontiveros denied Plaintiff's request on the ground that DISA "did not hire" Plaintiff before also remarking that DISA did not "want" Plaintiff and therefore DISA would not provide the subsistence expenses. *Id.* Plaintiff escalated her request to DISA's then-Chief of Staff, Mark Rosenstein, and Deputy Chief of Staff, Andres Lopez, to no avail. *Id.*

Plaintiff's role as Tasker Workflow Manager began on or about July 24, 2016. *Id.* However, just two days later, Ontiveros informed Plaintiff that Plaintiff was being re-assigned the title Issuance Manager and would be responsible for managing DISA's publications program

rather than performing Tasker Workflow Manager duties. *Id.* Managing DISA's publications program included none of the high-level communications work entrusted to Tasker Workflow Managers, required less training, and was "far less important." *Id.* at 6–7. In fact, "the priority of the work was so low that it had not been performed or attended to over the preceding year." *Id.* at 7. This reassignment "removed [Plaintiff] from job duties that would allow her to interact with DoD and DISA leadership, and largely limited her professional interactions with other employees." *Id.* Plaintiff also avers that DISA further revised Plaintiff's duties "to limit her interaction with senior leadership" without further clarification or specifics. *Id.* Plaintiff would not have accepted the position of Issuance Manager if it had been offered to her while she was residing in Germany. *Id.*

On July 29, 2016, Plaintiff followed up with Lopez and provided a printout of the regulation that supposedly required DISA to provide her with the requested subsistence expenses. Lopez responded by telling Plaintiff that DISA "would not be sad if [Plaintiff] found [herself] another job" and declined to provide the expenses. *Id.* Plaintiff claims that Lopez and Ontiveros regularly processed these requests for non-transgender employees without as much resistance, but Plaintiff does not provide the names or details of any such employees as comparators. *Id.* at 8.

Plaintiff then reported to the Deputy of Personnel, Doria Schauer, on or about August 3, 2016, that Plaintiff had been subjected to hostility by Lopez and Ontiveros given the denial of living expenses and the above comments. It was not until then that DISA approved Plaintiff's request for subsistence expenses, which Plaintiff believes occurred solely because Plaintiff complained to Schauer. *Id.* Nevertheless, Ontiveros largely stopped interacting with Plaintiff in the workplace following her complaints to Schauer despite Ontiveros remaining collegial with other colleagues. *Id.* In fact, "Ontiveros engaged with [Plaintiff] so little that it became obvious

to [Plaintiff] that Ontiveros was purposefully shunning her," like when Ontiveros would meet with employees in her office multiple times throughout the day but rarely spoke to Plaintiff.  *Id.* at 8–9.  Not only would Ontiveros avoid Plaintiff, but Ontiveros would also "hastily end" any interactions initiated by Plaintiff and be dismissive toward Plaintiff "for the entire two-year period" Plaintiff reported to Ontiveros.  *Id.* at 9.

Plaintiff learned in October 2016 that all members of Rosenstein's team—except for Plaintiff—were given parking passes for a parking garage adjacent to the building in which Plaintiff worked.  *Id.*  For instance, the DISA Workflow Manager, Chaneese Martin, and an Office Administrative Specialist, Aysa Barbie, were given parking passes and garage access on the day they began working in the Office of the Chief of Staff.  *Id.*  Yet Plaintiff was never given such a pass and instead "had to park in spaces that were often a 15-minute or longer walk to the building in which she worked."  *Id.*  However, Ontiveros, who had authority to secure Plaintiff a parking pass, ultimately issued Plaintiff such a parking pass on or around October 26, 2016, after overhearing Plaintiff inform another employee that Plaintiff had unequal access to the parking garage.  *Id.*  Plaintiff obtained parking garage access the next day.  *Id.* at 10.  When asked why Plaintiff had not previously been provided with parking garage access, Rosenstein responded that "It's not because you are transgender."  *Id.*  Management's untimely issuance of Plaintiff's parking pass left Plaintiff "feeling excluded and isolated in the workplace" buttressed by Plaintiff feeling "embarrassed that she had to walk from a more distant parking space than all of her co-workers." *Id.*

Ontiveros convened a meeting with other DISA management and Rosenstein in November 2016, to which Plaintiff was not invited.  *Id.*  At that meeting, management decided to transfer records management responsibility from Martin to Plaintiff because "Martin could not handle the

responsibility." *Id.* These additional duties were clerical in nature, not originally within the description for Plaintiff's Issuance Manager position, and were typically performed by lower grade employees. *Id.* Also in November 2016, Ontiveros expressly declined to invite Plaintiff to regular lunch outings that Ontiveros often participated in with other women in the office because the lunches were "a girls thing" and Plaintiff would not want to go anyway. *Id.* at 11. Plaintiff's request to join the lunches and Ontiveros' subsequent rejection occurred in an open office space witnessed by at least one co-worker, leaving Plaintiff feeling hurt, humiliated, and embarrassed in front of her peer(s). *Id.* These feelings were further compounded by the office's lack of recognition of Plaintiff's birthday during the first two years Plaintiff worked at DISA. *Id.*

On or around March 24, 2017, Plaintiff met with the DISA Executive Director, Anthony Montemerano, to describe how management had unfairly treated Plaintiff since she began working at DISA and to inform Montemerano that such treatment was due to Plaintiff's gender identity. *Id.* at 12. Montemerano admitted to Plaintiff that he was uncomfortable around transgender people, but nevertheless tried convincing Plaintiff that her allegedly disparate treatment was unrelated to her gender identity. *Id.* Ontiveros shortly thereafter began mocking Plaintiff in communicating with Plaintiff's co-workers. *Id.* For instance, Ontiveros approached a Program Management Analyst, Rebecca Clausen, and asked Clausen what she thought "it" was going to wear to work that day, referring to Plaintiff. *Id.* Ontiveros then forwarded an email to a co-worker mocking the valediction that Plaintiff used in an email sent by Plaintiff to Ontiveros. *Id.*[3]

Plaintiff subsequently requested that DISA Human Resources identify open positions that would align well with Plaintiff's skill set in or around January 2018. *Id.* at 13. On or about

---

[3] Similarly, Plaintiff alleges that various DISA employees called Plaintiff "sir" or referred to Plaintiff with male pronouns during her employment despite being aware that Plaintiff wished to be addressed as a female. (ECF No. 45 at 15).

February 8, 2018, Sue Cullen suddenly began emailing Plaintiff, falsely alleging that Plaintiff was not making progress on certain assignments. *Id.* Cullen's undue criticism halted after Plaintiff reported Cullen's behavior to then-Chief of Staff Joel Lindeman. *Id.* Plaintiff then complained to Executive Officer Jennifer Augustine on February 18, 2018, that Ontiveros created a hostile work environment for Plaintiff, that Plaintiff's work environment was having a negative impact on Plaintiff's health, and requested a transfer as an alternative to filing a formal discrimination complaint. *Id.* Although Plaintiff identified a position she thought was suitable for her transfer, Augustine insisted that there was "no billet for" that position. *Id.* Plaintiff also asked Ontiveros to transfer Plaintiff to another position, which Ontiveros ignored. *Id.*

On March 20, 2018, Plaintiff participated in a phone interview "for a position with the DOD Joint Service Provider ('JSP') at the Pentagon." *Id.* at 14. The interviewer ultimately told Plaintiff that he thought Plaintiff would be a good fit for "a position that involved stakeholder management" and that he would contact DISA Human Resources to iron out the details. *Id.* Soon after that interview, DISA Chief of Workforce Management, Ava Marie Howard, apologized to Plaintiff because, after Howard informed the interviewer that Plaintiff is transgender, the interviewer immediately exhibited disinterest in hiring Plaintiff. *Id.* The JSP did not hire Plaintiff. *Id.*

On April 20, 2018, Plaintiff told DISA's chaplain and Martin that Plaintiff was "finally" going to "cross the Rubicon" by filing a discrimination complaint regarding Plaintiff's ongoing mistreatment. *Id.* at 15.[4] Later that same day, Plaintiff then told two protocol employees that "Management is going to have a bad day on Monday" in reference to Plaintiff filing a

---

[4] *See Faulkenberry*, 2023 WL 3074639 at *12 n.4 ("On January 10, 49 B.C.E., General Julius Caesar entered roman territory by crossing the Rubicon, a stream in what is now Northern Italy. In crossing the Rubicon, Caesar began a civil war that signaled the end of the Roman Republic.") (citation and quotation omitted).

discrimination complaint based on gender identity with the Office of Special Counsel which would likely upset management. *Id.* Plaintiff also "jokingly suggested" to those protocol employees that the trio steal the office Keurig machine so that they could watch the effects of caffeine withdrawal on other employees. *Id.* at 16. Plaintiff "jokingly surmised that without caffeine, her coworkers would be in such a foul mood that they might attack one another, and that someone 'might not make it out alive,' or similar words." *Id.* The two protocol employees recounted Plaintiff's statements to Ontiveros and the Chief of Safety, Scott Addis, leading to Plaintiff being investigated under DISA's Violence in the Workplace policy for purported threats of violence. *Id.* Ontiveros advised Plaintiff on April 23, 2018, that Plaintiff was placed on administrative leave pending investigation of the threat of violence. *Id.* at 17. DISA then had security escort Plaintiff through the building's main hallway and took away Plaintiff's identification badge. *Id.*

Plaintiff proceeded by filing an informal EEO complaint alleging discrimination based on gender identity and retaliation for her complaints of discrimination on May 1, 2018. *Id.* Despite DISA ultimately concluding that Plaintiff had engaged in no wrongdoing and clearing Plaintiff of any charge of workplace violence, Ontiveros issued a Letter of Reprimand ("LOR") to Plaintiff for "Conduct Unbecoming" based on the alleged threat of violence. *Id.* at 18. The LOR asserted that Plaintiff's comments made DISA employees feel "uncomfortable about [her] possible intentions towards [her] coworkers" and Ontiveros further reprimanded Plaintiff for (1) forcing co-workers to assume Plaintiff's responsibilities while on administrative leave, and (2) forcing the expenditure of "numerous man-hours" to investigate Plaintiff's alleged threat. *Id.* at 18–19. Ontiveros continued to characterize Plaintiff's comments as threats of violence through at least July 2018 and even began alleging that Plaintiff threatened Ontiveros in a prior meeting. *Id.* at 19–20. Plaintiff contends that this treatment was specific to her. For example, unlike Plaintiff,

two non-transgender employees who previously allegedly made threats of violence or even engaged in workplace violence were not escorted off the premises by security. *Id.* at 20. However, in line with Plaintiff's treatment, "Agency policy requires that when an employee is reported to have made a threat of violence or engaged in violence in the workplace, that employee is immediately escorted off the premises and/or barred from entering." *Id.*

Around July 2018, management conducted an investigation into Plaintiff's harassment complaint but ultimately "took no apparent action to remedy the hostile environment or address the harassing behavior [Plaintiff] had described." *Id.* at 21. Coupled with Ontiveros' continued mistreatment of Plaintiff, Plaintiff was diagnosed with adjustment disorder, anxiety, depression, and sleep disturbances for which Plaintiff sought a reasonable accommodation of reassignment to a position in which Ontiveros would no longer supervise Plaintiff. *Id.* Ontiveros then obtained access to and forwarded Plaintiff's medical records submitted in connection with her accommodation request to Ontiveros' own personal email, Ontiveros' husband's personal email account, and Ontiveros' supervisors. *Id.* at 21–22. Plaintiff reported Ontiveros' disclosure of Plaintiff's medical records to DISA's EEO office, although Plaintiff does not specify when exactly this occurred. *Id.* at 22. Plaintiff was then reassigned to a new position—outside Ontiveros' supervision—"in 2018" and Plaintiff's previous Issuance Manager position went vacant for two years following Plaintiff's transfer. *Id.*

## II.    STANDARD OF REVIEW

The purpose of Federal Rule of Civil Procedure 12(b)(6) "is to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006) (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999)) (internal quotations

omitted).  To survive a Rule 12(b)(6) motion to dismiss, "detailed factual allegations are not required, but a plaintiff must provide the grounds of his entitlement to relief," which requires "more than labels and conclusions, or a formulaic recitation of the elements of a cause of action." *Petry v. Wells Fargo Bank, N.A.*, 597 F. Supp. 2d 558, 561–62 (D. Md. 2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 545 (2007)) (internal quotations omitted).  In considering a motion to dismiss, "the Court must accept the complaint's allegations as true, and must liberally construe the complaint as a whole." *Humphrey v. Nat'l Flood Ins. Program*, 885 F.Supp. 133, 136 (D. Md. 1995) (internal citations omitted).  The Court must also construe the facts and reasonable inferences from the facts in the light most favorable to the plaintiff.  *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997); *see also Petry*, 597 F. Supp. 2d at 562 ("Once a claim has been stated adequately . . . it may be supported by showing any set of facts consistent with the allegations in the complaint.") (quoting *Twombly*, 550 U.S. at 546).

"As a general rule, the court does not consider extrinsic evidence at the motion to dismiss stage . . . ."  *Reamer v. State Auto. Mut. Ins. Co.*, 556 F. Supp. 3d 544, 549 (D. Md. 2021) (other citation omitted).  However, "the court may consider, without converting the motion to dismiss into one for summary judgment, documents attached to the complaint as exhibits, and documents attached to a motion to dismiss if the document is 'integral to the complaint and there is no dispute about the document's authenticity.'"  *Id.* (quoting *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016)).  "A document is 'integral' to the complaint if its 'very existence, and not the mere information it contains, gives rise to the legal rights asserted.'"  *Reamer*, 556 F. Supp. 3d at 59 (citing *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 602, 611 (D. Md. 2011)).  Moreover, "In employment discrimination cases" such as this one, "courts often take judicial notice of EEOC charges and EEOC decisions" without converting a motion to

dismiss into one for summary judgment. *Yampierre v. Balt. Police Dep't*, No. ELH-21-12-9, 2022 WL 3577268, at *17 (D. Md. Aug. 18, 2022) (citing *Campbell v. Mayorkas*, No. 3:20-cv-697-MOC-DSC, 2021 WL 2210895, at *1 n.3 (W.D.N.C. July 1, 2021)).

Defendant styles its Motion as a motion to dismiss under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56.  "A motion styled in this manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure." *Pevia v. Hogan*, 443 F. Supp. 3d 612, 625 (D. Md. 2020).  The Court has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it." *Id.* at 626 (citation omitted).  "Ordinarily, summary judgment is inappropriate where the parties have not had an opportunity for reasonable discovery." *Id.*

Here, the Court will exercise its discretion by treating the Motion as one to dismiss under Fed. R. Civ. P. 12(b)(6) and limit its review to the instant pleadings while taking "judicial notice of [Plaintiff's] EEOC charges and EEOC decisions." *Yampierre*, 2022 WL 3577268 at *17; *see also Bowie v. Univ. of Md. Med. Sys.*, No. ELH-14-03216, 2015 WL 1499465, at *3 n.4 (D. Md. Mar. 31, 2015) ("Courts commonly consider EEOC charges as integral to a plaintiff's complaint, *i.e.*, effectively a part of the pleading, even if the EEOC charge is not filed with the Complaint."); *Stennis v. Bowie State Univ.*, 236 F. Supp. 3d 903, 907 n.1 (D. Md. 2017), *aff'd in part, vacated in part on other grounds*, 716 F. App'x 164 (4th Cir. 2017) (noting that "the EEOC charge and its related documents are integral to the Complaint . . . .").

### III.    ANALYSIS

A.  <u>Count I — Discriminatory Hostile Work Environment Under Title VII</u>

Defendant first argues for dismissal of Count I of Plaintiff's Second Amended Complaint that Plaintiff was subject to a discriminatory hostile work environment.  "The elements of a Title VII claim for hostile work environment are: (1) unwelcome conduct; (2) that is based on [a protected status]; (3) which is sufficiently severe or pervasive to alter . . . conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer."  *Milo v. CyberCore Techs., Inc.*, No. RDB-18-3145, 2019 WL 4447400, at *5 (D. Md. Sep. 17, 2019) (quoting *Strothers v. City of Laurel*, 895 F.3d 317, 328 (4th Cir. 2018)) (other citation omitted). This Court previously agreed with Defendant.  *See Faulkenberry*, 2023 WL 3074639 at *10–12. Specifically, the Court held that Plaintiff's First Amended Complaint failed to sufficiently allege element three, that Plaintiff's alleged treatment was severe or pervasive enough to alter the conditions of employment and create an abusive work environment for Plaintiff.  *Id.* at *10. Similar to Defendant's prior motion to dismiss or, in the alternative, for summary judgment, Defendant argues in its present motion that Plaintiff cannot establish the second and third elements of her hostile work environment claim.

Beginning with the second element, Defendant asserts that Plaintiff merely speculates that her alleged mistreatment was because of Plaintiff's gender identity, and that Plaintiff "has not alleged facts which would support that her gender identity was the driving causal factor for the majority of the actions and statements that [Plaintiff] perceived as hostile."  (ECF No. 47-1 at 23). "To satisfy the second element of a hostile work environment claim, the plaintiff must allege that she was harassed or otherwise discriminated against 'because of' her protected class."  *Prosa v. Austin*, No. ELH-20-3015, 2022 WL 394465, at *36 (D. Md. Feb. 8, 2022) (citing 42 U.S.C. §

2000e–2). "The plaintiff may satisfy this burden by showing that, 'but for' her protected class, she would not have suffered discrimination." *Id.*; *see also Grant v. Balt. City Police Dep't*, No. RDB-21-2173, 2022 WL 16746703, at *5 (D. Md. Nov. 7, 2022) ("An employee is harassed or otherwise discriminated against because of his or her gender if, but for the employee's gender, he or she would not have been the victim of the discrimination.") (internal quotations omitted).

In deciding the prior motion to dismiss or, in the alternative, for summary judgment, the Court noted that "Plaintiff has certainly set forth facts sufficient to withstand a motion to dismiss regarding suffering unwelcome conduct based on her protected status as a transgender woman." *Faulkenberry*, 2023 WL 3074639 at *10. The same conclusion applies to Plaintiff's Second Amended Complaint. Although Plaintiff concedes that there is no direct evidence indicating that Plaintiff's alleged mistreatment was because she is transgender, the Fourth Circuit has made clear in the hostile work environment context that "circumstantial evidence is often utilized in cases involving discrimination, and may in such circumstances be more persuasive than direct evidence." *Bennett v. CSX Trans., Inc.*, 552 F. App'x 222, 227 (4th Cir. 2014) (quotation omitted); *see also Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 23 (2d Cir. 2014) ("We have cautioned that a hostile work environment claim need not be supported by direct evidence" of harassment based on membership in a protected class); *Waldo v. Consumers Energy Co.*, 726 F.3d 802, 815 (6th Cir. 2013) ("[F]acially neutral incidents may be included in a hostile-work-environment analysis of the totality of the circumstances when there is some circumstantial or other basis for inferring that incidents sex-neutral on their face were in fact discriminatory.") (quotations omitted). This Court has further noted that animosity based on a plaintiff's membership in a protected class "may be shown by differential treatment of similarly situated []

employees" sufficient to satisfy the second element of a hostile work environment claim. *Prosa*, 2022 WL 394465 at *36.

Plaintiff's Second Amended Complaint sufficiently claims that her alleged mistreatment giving rise to a hostile work environment was because of her transgender status. Particularly supportive of this finding are Plaintiff's various allegations that her colleagues and supervisors treated Plaintiff sharply different following their learning of Plaintiff's transgender status, such as Ontiveros' shift in demeanor towards Plaintiff (and subsequent remarks to others regarding Plaintiff's transgender status) and the JSP interviewer suddenly recanting their support for Plaintiff's transfer. Plaintiff has also alleged that other similarly situated employees who are not transgender were treated differently than Plaintiff, such as DISA's selective provision of parking garage passes and inconsistent treatment towards employees who engaged in workplace violence or threats of violence. And while Defendant is correct that Plaintiff's alleged mistreatment may have been the result of merely personality conflicts, "When it comes to Title VII, the adoption of the traditional but-for causation standard means a defendant cannot avoid liability just by citing some *other* factor that contributed to its challenged employment decision. So long as the plaintiff's sex was *one* but-for cause of that decision, that is enough to trigger the law." *Bostock v. Clayton Cnty., Ga.*, 140 S. Ct. 1731, 1739 (2020) (emphasis added in second italics only). Accordingly, the Court cannot conclude that Plaintiff has failed to sufficiently plead that her alleged hostile work environment was because of her transgender status.

Regarding the third element, this Court previously explained that

The severe or pervasive element has both a subjective and objective component. To show that [a] defendant's conduct was sufficiently severe or pervasive, the objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances. The circumstances a court considers in determining whether the alleged conduct is objectively hostile include the frequency of the discriminatory conduct; its severity;

whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. To be sure, the severe and pervasive element sets a high bar, such that the law tolerates a level of poor conduct by an employer that is at odds with the courtesy and respect that an employee might not unreasonably expect. As such, [R]ude treatment by [coworkers], callous behavior by [one's] superiors, or a routine difference of opinion and personality conflict with [one's] supervisor, are not actionable under Title VII.

Similarly, offhand comments[ ] and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment. Indeed, even the utterance of an epithet may not, on its own, be enough to alter the conditions of employment under Title VII. Rather, a hostile work environment is one that is permeated with discriminatory intimidation, ridicule, and insult.

*Faulkenberry*, 2023 WL 3074639 at *10 (internal citations and quotations omitted).

The Court cannot conclude that the allegations in the Second Amended Complaint demonstrate a severe and pervasive environment of discrimination under the above standards. To be clear, Plaintiff has sufficiently pled that her alleged mistreatment subjectively took an exacting toll on Plaintiff for which she has allegedly suffered injuries. For example, "Plaintiff pleads she suffered anxiety and stress due to the way Ontiveros and others treated her, so much so that her treating physician diagnosed her with Adjustment Disorder and Plaintiff sought reasonable accommodation." (ECF No. 55 at 19). But Plaintiff's allegations do not satisfy the objective prong of the third element. Plaintiff's allegations amount to sporadic occurrences insufficient to meet the "extremely serious" standard described above. Most of Plaintiff's allegations charge colleagues or supervisors with treating Plaintiff in an unpleasant fashion and/or being outright disrespectful to Plaintiff, such as misgendering Plaintiff, referring to Plaintiff as "it," excluding Plaintiff from lunch outings, and declining to celebrate Plaintiff's birthday.

Complaints for hostile work environment that allege "rude treatment by [coworkers], callous behavior by [one's] supervisors, or a routine difference of opinion and personality conflict

with [one's] supervisor, are not actionable" "unless extremely serious." *Prosa*, 2022 WL 394465 at *36. Although Plaintiff disagrees, the Court still finds two recent decisions from this Circuit quite persuasive on this issue: *Milo*, 2019 WL 4447400, and *Hooten v. Walmart Inc.*, No. 5:20-CV-697-BO, 2021 WL 1234507 (E.D.N.C. Apr. 1, 2021). This Court found a hostile work environment claim insufficient in *Milo* where the transgender plaintiff "allege[d] a mere handful of incidents, none are physically threatening although [the plaintiff] was offended" by her co-workers misgendering the plaintiff, "the alleged incidents were sporadic, and none were extremely serious." *Milo*, 2019 WL 4447400 at *6. In *Hooten*, the Eastern District of North Carolina concluded that a plaintiff likewise failed to sufficiently allege a hostile work environment claim based on transgender discrimination where that plaintiff alleged that colleagues and/or supervisors rolled their eyes at the plaintiff, were overly critical of the plaintiff's work, misgendered and called the plaintiff "it," and generally subjected the plaintiff to "unprofessional or rude" treatment, even by a supervisor. *Hooten*, 2021 WL 1234507 at *3. Plaintiff's allegations fair no better. Ontiveros' and other employees' callous remarks to Plaintiff, although reprehensible, demonstrate that those individuals may have violated "a general civility code" occasionally over the course of several years rather than create a work environment permeated by severe harassment and mistreatment. *Id.*; *see also EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306 (4th Cir. 2008) (finding conduct severe and pervasive where the plaintiff was ridiculed on a daily basis and had his timecard hidden, his computer equipment unplugged, and his business cards defaced frequently). Excluding Plaintiff from certain social outings and not celebrating Plaintiff's birthday likewise fails to allege a severe and pervasive hostile work environment. *See Daugherty v. Food Lion, LLC*, No. 1:04CV278, 2006 WL 1642233, at *13 (W.D.N.C. June 13, 2006) (finding plaintiff's allegations that his supervisor ignored him and "refuse[d] to make eye contact with him" was callous and rude but insufficient to

allege a hostile work environment); *Dieng v. Am. Institutes for Rsch. in Behav. Scis*., 412 F. Supp. 3d 1, 14–15 (D.D.C. 2019) (dismissing hostile work environment claim premised on the denial of teleworking, yelling at the plaintiff during staff meetings, ignoring the plaintiff, and constantly questioning the plaintiff's work); *LaRosa v. Harford Cnty., Md.*, No. CIV.A. CCB-08-2560, 2010 WL 1375321, at \*7 (D. Md. Mar. 26, 2010) ("Although [the alleged harasser's] name-calling . . . and decision to exclude [plaintiff] from workplace prayer and company training are instances of harassment, they also fail to support a hostile work environment claim.").  Nor does considering these sporadic instances in the aggregate rise to the level of creating a severe and pervasive hostile work environment under the totality of the circumstances.  Put simply, the allegations underlying Plaintiff's hostile work environment claim in her Second Amended Complaint are effectively the same as those which this Court found to be insufficient in the First Amended Complaint. Accordingly, Defendants motion to dismiss is granted with respect to Count I.

### B. Count II — Discriminatory Retaliation Under Title VII

Defendant next argues that Plaintiff's Second Amended Complaint fails to state a plausible claim for retaliation under Title VII.  A plausible claim of retaliation under Title VII "has three elements: the plaintiff must prove that [s]he (1) engaged in a protected activity; (2) suffered an adverse employment action; and (3) that a causal link between the protected activity and the adverse employment action exists." *Ciociola v. Balt. City Bd. of Sch. Comm'rs*, No. CV CCB-15-1451, 2017 WL 4280729, at \*6 (D. Md. Sept. 27, 2017); *see also* 42 U.S.C. § 2000e-3(a).  Specific to element two, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, 'which in [the Title VII retaliation] context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64 (2006) (quoting *Rochon v. Gonzales*,

438 F.3d 1211, 1219 (D.C. Cir. 2006)).  And as the Court previously noted with reference to element three, "[s]ince, by definition, an employer cannot take action because of a factor which it is unaware, the employer's knowledge that the plaintiff engaged in protected activity is absolutely necessary to establish the third element of the prima facie case." *Faulkenberry*, 2023 WL 3074639 at *12 (citing *Smith v. Vilsack*, 832 F. Supp. 2d 573, 586 (D. Md. 2011)).  Where a plaintiff's claim of unlawful retaliation is not premised on direct evidence, as is the case here, courts employ the three-step burden shifting framework from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  And under the *McDonnell Douglas* framework, "Once the plaintiff establishes a prima facie case of retaliation, the burden shifts to the defendant to present a legitimate, non-discriminatory reason for the adverse employment action.  If the defendant presents such a reason, the burden shifts back to plaintiff to demonstrate that this reason is mere pretext."  *Hagee v. Bealefeld,* No. CIV.A. BPG-08-0570, 2009 WL 2913475, at *4 (D. Md. Sept. 2, 2009) (citing *McDonnell*, 411 U.S. at 802–04).

The Court previously identified four instances of protected activity from which Plaintiff's retaliation claim could be based, which are the same instances alleged in Plaintiff's Second Amended Complaint: (1) Plaintiff's August 3, 2016, complaint to Schauer concerning hostility exhibited by Lopez and Ontiveros, (2) Plaintiff's March 24, 2017, meeting with Montemerano, (3) Plaintiff's February 18, 2018, complaint to Augustine, and (4) Plaintiff's April 20, 2018, conduct and conversations leading to Plaintiff's placement on administrative leave on April 23, 2018.  All instances of alleged discrimination pre-dating Plaintiff's August 3, 2016, complaint to Schauer are therefore unactionable given that no protected activity had occurred yet, which includes Plaintiff's reassignment in July 2016 and Lopez's comment that DISA "would not be sad if [Plaintiff] found [herself] a new job."  (ECF No. 45 at 7).

Regarding the August 3, 2016, complaint, Plaintiff does not allege that Schauer informed any other employee, supervisor, or alleged retaliator of her complaints to Schauer.  Plaintiff merely indicates that her expenses request was processed shortly thereafter and that Ontiveros interacted with Plaintiff less frequently, but alleges no connection therebetween.  There can thus be no claim of retaliation rooted in Plaintiff's August 3, 2016, complaint.  *See Kennedy v. McHugh*, No. CIV. CCB-13-390, 2013 WL 4541404, at *2 (D. Md. Aug. 23, 2013), *aff'd sub nom. Kennedy v. Dep't of the Army*, 554 F. App'x 248 (4th Cir. 2014) (dismissing plaintiff's retaliation claim for failure to state a claim where plaintiff failed to offer "specific evidence" that defendant knew plaintiff engaged in protected activity); *Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 124 (4th Cir. 2021).  Plaintiff's belief that Lopez and Ontiveros approved her expenses request "only because she reported to Schauer that they were treating her less favorably" fares no better.  *See Kennedy*, 2013 WL 4541404 at *2 (finding plaintiff's "mere belief" that defendant was aware of plaintiff engaging in protected activity "insufficient to support a plausible claim for relief").  There can also be no claim for retaliation based on the March 24, 2017, meeting for the same reason—there is no indication or allegation that Montemerano told anybody about the March 24, 2017, meeting with Plaintiff or that Plaintiff suffered any purported adverse employment action(s) resulting from discussing her alleged mistreatment during that meeting.  Plaintiff likewise fails to allege that Augustine informed anybody of the February 18, 2018, meeting and the specific complaints Plaintiff lodged during that meeting.  The Court's prior conclusion regarding this instance remains the same: "Plaintiff strongly insinuates that Ms. Ontiveros learned of this conversation [s]oon after it occurred.  However, by the time this February 18, 2018, conversation occurred, Plaintiff had already experienced nearly two years of unprofessional treatment from certain co-workers.  The Amended Complaint [and the Second Amended Complaint] do[] not indicate that the conduct

Plaintiff was already experiencing significantly escalated following this conversation.  Rather, the worst Plaintiff alleges to have occurred soon following this conversation was Ms. Ontiveros' refusal to transfer Plaintiff."  *Faulkenberry*, 2023 WL 3074639 at \*13.

Plaintiff does allege, though, that her April 20, 2018, statements complaining of discrimination and indicating her intent to file an EEO complaint were shared with others, namely Addis and Ontiveros.  *See DeMasters v. Carilion Clinic*, 796 F.3d 409, 417 (4th Cir. 2015) ("This Circuit, as well as the other Courts of Appeals, also has articulated an expansive view of what constitutes oppositional conduct, recognizing that it 'encompasses utilizing informal procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities.'") (quoting *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 259 (4th Cir. 1998)); *see also id.* (citing *Moore v. City of Philadelphia*, 461 F.3d 331, 343 (3d Cir. 2006), for the proposition that "informal protests of discriminatory employment practices[,] including making complaints to management" constitute protected activity).  The Court cannot conclude that Plaintiff plausibly alleges her ensuing placement on administrative leave was retaliatory based on Plaintiff's April 20, 2018, statements for the same reason explained in the Court's prior Memorandum Opinion, though: Plaintiff has insufficiently pled that the administrative leave was because of the purported protected activity rather than Plaintiff's perceived threats of violence.  Plaintiff concedes that the reason she was placed on administrative leave was because of her comment that "Management is going to have a bad day on Monday," which was made contemporaneously with Plaintiff's additional statements that she was going to "cross the Rubicon," that "come Monday [management] would get theirs," and the suggestion that Plaintiff steal the office Keurig machine, after which someone "might not make it out alive."  (ECF No. 45 at 15–16).  This Court as well as others in the Fourth Circuit have repeatedly found that

purported adverse employment actions are rendered implausible as retaliatory at the motion to dismiss stage where there is such an obvious alternate explanation for the employment actions. *See Nance v. Clerk of Cir. Ct. for Balt. City*, No. 1:23-CV-01869-JMC, 2023 WL 8650346, at *7 (D. Md. Dec. 14, 2023) (dismissing Title VII retaliation claim after finding no causal connection between purported protected activity and adverse employment action because there was an obvious alternate explanation); *Barnhill v. Garland*, 636 F. Supp. 3d 592, 605 (E.D. Va. 2022) (holding that plaintiff's Title VII claim was "rendered implausible in light of an obvious alternative explanation" for the adverse employment action).  This conclusion is buttressed by the context surrounding the statements, namely that Plaintiff is a decorated Army Special Forces veteran with combat experience.  Nor has Plaintiff presented sufficient allegations or argument to demonstrate pretext.  Accordingly, Plaintiff has not plausibly alleged a Title VII retaliation claim based on her placement on administrative leave resulting from her April 20, 2018, statements.

However, Plaintiff has amended her complaint to sufficiently allege that the LOR issued by Ontiveros on May 30, 2018, constitutes an adverse employment action which plausibly could have been in retaliation of Plaintiff's April 20, 2018, complaints of discrimination and statements regarding her intent to file an EEO complaint.[5]  The Court previously rejected the notion that the LOR constituted an adverse employment action because "Plaintiff ha[d] not alleged that the LOR mentioned a threat of future discipline, and it would not have dissuaded a reasonable worker from making an EEO complaint."  *Faulkenberry*, 2023 WL 3074639 at *14 n.5; *see also Smith*, 832 F. Supp. 2d 573 at 583 ("Generally, a reprimand, whether oral or written, does not *per se* significantly

---

[5] Plaintiff notes in her Second Amended Complaint that, while on administrative leave, she filled an informal EEO complaint on May 1, 2018, alleging discrimination based on gender identity and retaliation for her complaints of discrimination.  (ECF No. 45 at 17).  However, similar to instances (1) through (3) of purported protected activity discussed above, Plaintiff does not allege that Defendant was made aware of this informal EEO complaint, or that any purported adverse employment actions such as the LOR occurred as a result of the May 1, 2018, complaint.

affect the terms or conditions of employment, but only becomes an adverse action if it works a real, rather than speculative, employment injury.") (quotation omitted).  But Plaintiff's Second Amended Complaint now alleges that "The [LOR] issued states that it was to remain in [Plaintiff's] Official Personnel Folder (OPF) for two years, during which time it could be relied upon as a basis for additional disciplinary action, up to and including removal from federal service."  (ECF No. 45 at 19).  Both this Court and the Fourth Circuit have found that internal reprimands qualify as adverse employment actions where they "could lead [to a plaintiff's] demotion or termination," or where they are documented in a plaintiff's personnel file.  *See Chika v. Planning Rsch. Corp.*, 179 F. Supp. 2d 575, 586–87 (D. Md. 2002); *Prosa*, 2022 WL 394465 at *32 ("[T]he Fourth Circuit has also ruled that 'a letter of warning did amount to an adverse action because [plaintiff's supervisor] warned [plaintiff] that future disciplinary actions could result in further discipline, including termination.'") (quoting *Barnes v. Charles Cnty. Pub. Schs.*, 747 F. App'x 115, 119 (4th Cir. 2018) (per curiam)); *Nye v. Roberts*, 145 F. App'x 1, 6 (4th Cir. 2005) (reversing district court's conclusion that a reprimand was not an adverse employment action because the reprimand could be used in a progressive disciplinary scheme for future suspension or termination).  The Court is also satisfied that there are sufficient allegations that the LOR was retaliatory given the totality of the circumstances under which it was created, both substantively and temporally.  Substantively, the LOR was issued based on Plaintiff's perceived threat of violence *after* Plaintiff's conduct had already been investigated and found to be unsubstantiated, which Plaintiff alleges Ontiveros was aware of at the time Ontiveros issued the LOR.  Temporally, the LOR was issued roughly a month after Plaintiff's communication of her intent to file an EEO complaint (and presumably even closer to the date Ontiveros issued the LOR considering Plaintiff's statements had to be conveyed to Ontiveros), which by itself is sufficient to conclude at the motion to dismiss stage that the LOR

could have plausibly been motivated by retaliatory animus.  *See Hammoud v. Jimmy's Seafood, Inc.*, 618 F. Supp. 3d 219, 238 (D. Md. 2022) ("[T]emporal proximity between an employer's knowledge of protected activity and an adverse employment action suffices to establish a prima facie case of causation where the temporal proximity is 'very close.'") (quoting *Jenkins v. Gaylord Ent. Co.*, 840 F. Supp. 3d 873, 881 (D. Md. 2012)).

Accordingly, Defendant's motion is granted with regard to Count II to the extent that Plaintiff has not plausibly alleged a claim of retaliation under Title VII for any conduct preceding April 20, 2018, or set forth any plausible adverse employment actions taken as a result of the April 20, 2018, conduct aside from Ontiveros' issuance of the LOR.  Thus, Plaintiff's Count II will remain to the extent that it alleges that Defendant unlawfully retaliated against Plaintiff based on her April 20, 2018, conduct through Ontiveros' issuance of the LOR.[6]

C.  Count III — Violation of the Confidentiality Provisions of the Rehabilitation Act

Finally, Defendant argues for dismissal of Count III of Plaintiff's Second Amended Complaint "with respect to Ms. Ontiveros' email to other supervisors and management because Plaintiff provided the document to the agency, and Ms. Ontiveros shared that information with her supervisors and human resources in furtherance of Plaintiff's reasonable accommodation request." (ECF No. 47-1 at 37).  The Rehabilitation Act of 1973, among other things, regulates medical inquiries by employers and requires employers to safeguard certain medical information obtained by employees as confidential.  *See* 42 U.S.C. § 12112(d).  "Once an employee's medical

---

[6] To be clear, Plaintiff's various allegations regarding the derogatory comments made about and to her and Plaintiff being shunned, isolated, or developing friction between her and her alleged discriminators, even if they occurred after April 20, 2018, do not constitue adverse employment actions for which Plaintiff's Title VII claim may be based.  *See Harris v. Charles E. Smith Life Cmtys.*, No. CV MJM-21-1242, 2022 WL 4777592, at *7 (D. Md. Oct. 3, 2022) ("Employment actions such as discharge, demotion, decrease in pay or benefits, loss of job, title or supervisory responsibility, or reduced opportunities for promotion are typically found to be an adverse action.  However, harsh criticism, teasing, humiliation, bullying, and refusing to address employment-related complaints generally do not rise to the level of an adverse employment action."); *Blount v. Dep't of Health and Hum. Servs.*, 400 F. Supp. 2d 939, 942 (D. Md. 2004) ("[D]isparaging remarks made by a supervisor do not state an adverse employment action.").

information is legitimately obtained through employer inquiries or examinations, that information

must be 'treated as a confidential medical record.'" *Katz v. U.S. Dep't of Just.*, No. 1:20-cv-554,

2021 WL 3809034, at *6 (E.D. Va. Aug. 26, 2021) (quoting 42 U.S.C. § 12112(d)(4)). But "As

an exception to the rule, supervisors and managers may be informed regarding necessary

restrictions on the work or duties of the employee and necessary accommodations." *Id.* "[I]n order

to state a claim under the Rehabilitation Act's confidentiality provisions . . . a plaintiff must show

that an unauthorized disclosure of medical information *resulted in* a tangible injury." *Porfiri v.*

*Eraso*, 121 F. Supp. 3d 188, 199 (D.D.C. 2015) (quotation omitted) (emphasis in original).

Plaintiff alleges that she submitted various medical documents supporting her reasonable

accommodation request to be reassigned to a position in which Ontiveros would no longer be

Plaintiff's supervisor. Plaintiff also alleges that, not only was Plaintiff's request for a reasonable

accommodation impermissibly shared with certain individuals, but also that the medical records

within that request were impermissibly shared with others unrelated to her requested

accommodation. Defendant clarifies that the supervisors who obtained Plaintiff's medical records

include Lopez, Lindeman, and "Ms. Glover, a human resource representative." (ECF No. 47-1 at

38). Defendant also argues that Plaintiff suffered no tangible harm from the alleged disclosures.

Defendant previously made these arguments in its first motion to dismiss or, in the

alternative for summary judgment, Plaintiff's First Amended Complaint. The Court rejected them

then and will do so now for the same reasons expressed in the prior Memorandum Opinion.

Plaintiff's Second Amended Complaint alleges that Ontiveros was Plaintiff's primary harasser

along with alleged misconduct by Lopez. As was the case with Plaintiff's First Amended

Complaint, "Plaintiff has specifically alleged that none of these individuals had a need to know of

Plaintiff's request for a reasonable accommodation, let alone a need to have access to the

documents supporting that request." *Faulkenberry*, 2023 WL 3074639 at *15. Combined with the Court's conclusion that the confidentiality provisions establish only that supervisors and managers have the right to know "of the necessary restrictions and accommodations" to which a plaintiff requires, Plaintiff plausibly alleges that Defendant violated those confidentiality provisions by impermissibly sharing the *contents* of Plaintiff's medical documents. *See id.* ("[T]he plain language [of the Rehabilitation Act] establishes only that supervisors and managers have the right to know of the necessary restrictions and accommodations; this does not automatically equate to having a right to know of the contents within the documents supporting such restrictions or accommodations."). For purposes of tangible injury, Plaintiff further alleges that this violation of the Rehabilitation Act exacerbated her anxiety and caused her emotional distress. *See Koch v. Walter*, 935 F. Supp. 2d 164, 176 (D.D.C. 2013) (noting that plaintiffs may demonstrate injuries for violations of § 12112(d) "through actual damages (*emotional*, pecuniary or otherwise)" and dismissing plaintiff's claim for violations of § 12112(d) for failing to assert any harm, "*emotional*, financial, or otherwise") (emphasis added).

While Plaintiff may maintain Count III based the above allegations, Count III will not otherwise be expanded. Specifically, as in its previous opinion, the Court will again dismiss the portions of Count III that seek redress for Ontiveros allegedly forwarding Plaintiff's medical documents to herself, and for Ontiveros sending emails to her husband's personal account. Regarding Ontiveros forwarding the emails to herself, Plaintiff still does not allege that doing so exacted any additional injury; rather, Plaintiff merely asserts that this "created a risk of further disclosure," which is too speculative to be actionable. (ECF No. 45 at 22); *see also Faulkenberry*, 2023 WL 3074639 at *15 ("Plaintiff, as should be expected, has made no allegations that the act of someone impermissibly in possession of the documents forwarding it to themselves somehow

causes Plaintiff additional injury.").   Regarding Ontiveros sending emails to her husband's personal account, Plaintiff again fails to allege that such emails contained Plaintiff's medical information; rather, Plaintiff alleges only that these emails included information "about her complaints of discrimination and retaliation."  (ECF No. 45 at 22).  Accordingly, Defendant's motion is granted to the extent that Plaintiff's Count III may not be predicated on the emails Ontiveros sent to her own personal email account or the emails Ontiveros sent to her husband's personal email account.   In other words, Plaintiff's Count III may be predicated only on her allegations that Defendant violated the confidentiality provisions of the Rehabilitation Act by forwarding Plaintiff's medical documentation associated with her accommodation request to Ontiveros and Ontiveros' supervisors despite none of them needing to know the contents of such documents.

### D.  Plaintiff's Motion for Discovery Pursuant to Rule 56(d)

As noted previously, "Ordinarily, summary judgment is inappropriate 'where the parties have not had an opportunity for reasonable discovery."  *Head v. United States*, No. CV GJH-22-238, 2022 WL 17623492, at *1 (D. Md. Dec. 13, 2022), *reconsideration denied*, No. CV GJH-22-238, 2023 WL 2163177 (D. Md. Feb. 22, 2023) (quotation omitted).  Federal Rule of Civil Procedure 56(d) provides that, "If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify the opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations to take discovery; or (3) issue any other appropriate order."  Rule 56(d) affidavits "cannot simply demand discovery for the sake of discovery."  *Hamilton v. Mayor and City Council of Balt.*, 807 F. Supp. 2d 331, 342 (D. Md. 2011).  Rather, a Rule 56(d) motion is properly justified where "the facts identified in a Rule 56 affidavit [are] essential to [the] opposition."  *Head*, 2022 WL 17623492 at

*2 (quotation omitted).  "A non-moving party's Rule 56(d) request for additional discovery is properly denied 'where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment.'"  *Id.* (quoting *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995)).

Plaintiff's request to conduct additional discovery "to have the opportunity to present facts essential to her opposition to Defendant's motion for summary judgment" is effectively moot given that the Court elects to treat Defendant's motion as one to dismiss under Rule 12(b)(6).  In other words, Plaintiff need not conduct additional discovery to oppose a motion for summary judgment when that motion is treated as one to dismiss.  However, the Court previously granted Plaintiff's motion to stay the operative scheduling order deadlines pending resolution of Defendant's motion. *See* (ECF No. 53).  Therein, Plaintiff noted that "The Parties have exchanged written discovery requests focused only on Claim III" following the Court's disposition of Defendant's first motion to dismiss or, in the alternative, for summary judgment (also treated as a motion to dismiss).  *Id.* at 2.  Accordingly, although Plaintiff's motion is moot, the Court finds that extending the discovery period is warranted given that Plaintiff's Second Amended Complaint cures some of the deficiencies previously identified in Count II as explained above such that Plaintiff has a plausible claim for retaliation under Title VII.

Defendant must nevertheless abide by Federal Rule of Civil Procedure 12(4).  To the extent that Counts II and III of Plaintiff's Second Amended Complaint remain, Defendant shall file a responsive pleading addressing those remaining allegations within fourteen (14) days of the date of this Memorandum Opinion.  Next, noting the appropriateness of additional discovery and the fact that the parties have already engaged in some discovery—both at the administrative level and as represented in Plaintiff's prior motion to stay—the Court will direct the parties to confer and

jointly propose new scheduling order deadlines given the Court's prior decision to stay the scheduling order pending resolution of the present motions.

## IV.    CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss Plaintiff's Second Amended Complaint or, in the Alternative, for Summary Judgement (ECF No. 47), treated as a motion to dismiss, is granted in part and denied in part.  Additionally, Plaintiff's Motion for Discovery Pursuant to Rule 56(d) (ECF No. 54) is denied as moot, but the Court will permit additional discovery as explained above.  A separate Order follows.

Date: <u>February 6, 2024</u>                        _____/s/_____
                                                        J. Mark Coulson
                                                        United States Magistrate Judge